[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 7, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-14914

_____

D. C. Docket No. 01-02849-CV-ASG

MILLENNIUM PARTNERS, L.P., on
its own behalf and f.u.b.o. all brokers and
any other entities claiming an interest in the subject
property,
AIG TRADING CORPORATION, on its
own behalf and f.u.b.o. of all brokers and other entities
claiming an interest in the subject property,

Plaintiff-Appellees,

GREAT AMERICAN INSURANCE
COMPANY, INC., et al.,

Plaintiffs,

ONE BEACON INSURANCE CO.,

Intervenor-Plaintiff
Appellee,

versus

COLMAR STORAGE, LLC,

Defendant-Appellant,

CREDIT LYONNAIS ROUSE (USA)
LIMITED,

Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(August 7, 2007)**

Before PRYOR, KRAVITCH and ALARCÓN,[*] Circuit Judges.

ALARCÓN, Circuit Judge:

Appellant Colmar Storage, L.L.C. ("Colmar") appeals from the final

judgments entered by the District Court in favor of Appellees AIG Trading Corp.

("AIG"), Millenium Partners, LLP ("Millenium"), and One Beacon Insurance

Company ("One Beacon").[1]  Colmar contends that the District Court committed

reversible error by (1) denying its motion for judgment as a matter of law with

respect to Millenium's, AIG's and One Beacon's bailment claims; (2) denying its

motion for leave to add the anti-subrogation rule as an affirmative defense; (3)

admitting evidence that was prejudicial; (4) overturning the jury's damages verdict

---

[*]Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting
by designation.

[1]One Beacon insured Irving R. Boody & Co., Inc. ("Boody"), a commodity trading
company.

as to Millenium, AIG and One Beacon, and awarding each of them an additur and a new trial on certain damages; and (5) awarding prejudgment interest to Millenium, AIG and One Beacon that ran from October 4, 2000, Millenium's, AIG's, and Boody's date of loss. We will affirm because we conclude that the District Court acted within its discretion in denying Colmar's motion to amend and admitting evidence regarding the denial of a building permit and a subsequent remedial measure. The District Court also did not err in denying Colmar's motion for judgment as a matter of law, awarding additurs, granting a new trial regarding actual damages, and awarding Millenium, AIG and One Beacon prejudgment interest from the date of Millenium's, AIG's, and Boody's loss.

**I**

Colmar is engaged in the business of storing coffee and other perishables. In February 2000, it leased a warehouse from Cramco Realty Inc. ("Cramco"). The warehouse is located in a low-lying area of Miami, Florida, that is prone to flooding when it rains heavily. The warehouse was certified by the New York Board of Trade's Coffee and Cocoa Exchange Board ("Coffee Exchange") for the storage of coffee. Pursuant to the terms of the lease agreement, Cramco constructed two subterranean truck loading wells, but they were built without a county building permit. The Miami-Dade County Department of Environment

3

Resources Management ("DERM") refused to issue a building permit for the construction because the ramps were not adequately equipped with pumps and drains. Colmar stored coffee for Millenium, AIG, and Boody in the warehouse.

On October 2 and 3, 2000, a tropical storm system settled over the Miami area. By the time the storm had subsided, over 15 inches of rain had fallen near the warehouse. The National Weather Service issued a flood watch on October 2, 2000. However, it was not until the early morning of October 4, 2000, that a flood warning was issued by the National Weather Service. Although Colmar learned that heavy rains were expected, it did not set up a provisional pump in the warehouse.

After the storm had subsided, Colmar inspected the warehouse and discovered that it had been inundated with water. In parts of the warehouse, the flood waters rose as high as twelve to sixteen inches off the ground level. As a result, the bags of coffee beans on the lowest tier were contaminated by water. The coffee beans that had been exposed to water had swollen. This caused some of the bottom bags to burst and topple over entire pallets of the coffee beans. Water from the bottom tier of bags percolated up into the second tier. This made the coffee beans in the bags swell and caused additional pallets to fall over. Colmar completed its clean-up efforts of the warehouse on January 22, 2001.

## II

On June 29, 2001, Millenium and AIG each filed separate complaints against Colmar alleging breach of contract, bailment, and negligence. Millenium's and AIG's claims were brought on behalf of their respective subrogated insurers, Westport Insurance Corporation and Lexington Insurance Company ("Lexington"). They alleged that Colmar breached its duty to employ reasonable care to protect the coffee beans stored at Colmar's facility from water damage. They prayed for compensatory and consequential damages. Great American Insurance Company, Inc. ("Great American"), One Beacon, and Dornoch Ltd. ("Dornoch") also filed complaints alleging similar claims. Their complaints were consolidated with the complaints filed by Millenium and AIG.

On August 15, 2003, Colmar moved for summary judgment. It asserted that the economic loss doctrine barred Great American's, One Beacon's, Dornoch's, Millenium's and AIG's tort claims for negligence and bailment, that their damages were caused by an Act of God, and that AIG's claim was barred by the anti-subrogation rule. The District Court granted Colmar's motion to dismiss the negligence claims. It denied the motion to dismiss the bailment claims. The District Court also dismissed the motion for summary judgment based on the Act of God defense because conflicting expert testimony concerning the foreseeability

5

of the tropical storm event and flooding presented genuine issues of material fact that should be decided at trial. The District Court refused to consider the anti-subrogation rule defense, which was initially raised in Colmar's motion for summary judgment in regard to AIG's claims, because it was not raised in Colmar's answer or the joint pretrial status report.

The breach of warehouse contract and bailment claims were tried to a jury. Great American's, One Beacon's, Dornoch's, Millenium's and AIG's bailment claim was based on discrete theories of liability: Colmar breached its duty to exercise reasonable care to prevent damage from flooding; Colmar failed to exercise reasonable care in its remediation efforts to prevent damage to the coffee beans caused by the flooding of the warehouse. Great American, Dornoch, and Colmar each stipulated to the value of the damaged coffee beans that were destroyed. Millenium, AIG and Colmar stipulated to the number of bags of coffee beans that were destroyed.

At trial, Colmar requested that a jury instruction be given that would "instruct the jury to allocate the damages pursuant to the different potential actionable conduct on the part of the defendant." Specifically, Colmar argued to the District Court:

> in your instruction on Count 2, you tell the jury that the
> plaintiff's claim Colmar breached its duty to act as a

> reasonably prudent warehouseman, both in failing to protect the goods at the time of the flooding incident and in failing to protect the goods from further damage after the flooding incident.
>
> These are two distinct claims, and yet in this damages instruction, you are peremptorily telling them what the damages are. . . . [T]hey need to be instructed that they have to allocate those damages according to the incident that caused it.

In denying Colmar's request, the District Court stated: "I don't find a basis for allocation here based upon the evidence of this case." On appeal, Colmar has not challenged the District Court's denial of the request for an allocation instruction. Thus, that claim is forfeited. *See Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

The jury returned a verdict for Colmar on the breach of warehouse contract claim but found for Great American, One Beacon, Dornoch, Millenium and AIG on their bailment claim. The jury did not find for Colmar on its "Act of God" affirmative defense. The jury awarded Great American, One Beacon, Dornoch, Millenium and AIG roughly 40-60% of the stipulated damages.

Great American, One Beacon, Dornoch, Millenium and AIG filed post-trial motions seeking judgment as a matter of law or a new trial on damages. Colmar

7

also filed motions for judgment as a matter of law and for a new trial. The District Court awarded Great American, One Beacon, Dornoch, Millenium and AIG additurs as to their claimed ancillary damages. It also awarded an additur and entered judgment as a matter of law as to the value of lost coffee for Great American and Dornoch. It ordered a new trial on the value of lost coffee for Millenium, AIG and One Beacon. Each of Colmar's post-trial motions was denied.

The retrial on the value of the coffee took place on April 12-14, 2005. Colmar stipulated to the value of Millenium's and AIG's coffee beans damaged by the flood. Thus, the jury was asked to determine the value of One Beacon's loss caused by Colmar's failure to exercise reasonable care. Colmar and One Beacon stipulated to a fair market value per pound of coffee and that at least 691 bags of coffee beans owned by One Beacon's insured were destroyed. In addition, One Beacon claimed that an additional 3059 bags of coffee were damaged. The jury rejected One Beacon's claim, finding that no additional bags had been damaged or destroyed.

The District Court entered final judgments for AIG on May 24, 2005, and for Millenium and One Beacon on June 8, 2005. Colmar has timely appealed. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

8

## III

### A

Colmar contends that the District Court abused its discretion when it denied Colmar's motion for leave to amend its pleadings to add the anti-subrogration rule as an affirmative defense. Lexington, AIG's subrogated property insurer, is also Colmar's liability insurer. Colmar maintains that it did not discover that Lexington was AIG's insurer until it had completed a Rule 30(b)(6) of the Federal Rules of Civil Procedure deposition of an AIG representative on July 24, 2003. Consequently, it asserts that it was unaware of the availability of the defense until after that date.

On August 15, 2003, Colmar filed a motion for leave to amend its affirmative defenses, seeking to add an anti-subrogation defense against the claims brought by AIG. Since Colmar filed its motion for leave to amend after the District Court's scheduling order deadline had passed, the District Court indicated that Colmar had to demonstrate good cause under Rule 16(b) of the Federal Rules of Civil Procedure before it would consider whether amendment was proper under Rule 15(a) of the Federal Rules of Civil Procedure. Based upon Colmar's assertion that it possessed no knowledge of Lexington's position as an insurer of AIG prior to the July 2003 deposition, the District Court initially determined that Colmar had good cause to amend and, therefore, granted its motion for leave to amend the

9

answer. However, in a motion for reconsideration, AIG presented evidence that Colmar had in fact been furnished both documents and disclosures indicating that Lexington was AIG's insurer as early as June of 2002. Furthermore, on July 24, 2002, AIG specifically disclosed to Colmar that Lexington was one of its insurers. Relying upon Rule 50 of the Federal Rules of Civil Procedure, the District Court exercised its discretion to reconsider its previous order and determined that the evidence presented in support of AIG's motion for reconsideration was sufficient to refute the facts upon which Colmar had relied to demonstrate "good cause" for leave to amend under Rule 16 of the Federal Rules of Civil Procedure. We review for abuse of discretion the District Court's denial of Colmar's request for leave to amend. *Fed. Deposit Ins. Corp. v. Morley*, 915 F.2d 1517, 1523 (11th Cir. 1990).

It is undisputed that Colmar received documents and disclosures indicating that Lexington was AIG's insurer as early as June of 2002. Colmar explains its delay in requesting amendment of its answer in that "Lexington's status as an insurer of AIG is not alone problematic; rather, *it is Lexington's payment of AIG's claim and subrogation to AIG's right of recovery against Colmar* that brings the anti-subrogation rule into play." However, it is clear that Lexington's payment of AIG's insurance claim was likely inevitable and that, with some investigation, Colmar could have discovered its possible anti-subrogation defense. "If we

10

considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998). The fact that Colmar failed to conduct such investigation does not equate to "good cause" for leave to amend under Rule 16 of the Federal Rules of Civil Procedure. The District Court did not abuse its discretion in granting AIG's motion for reconsideration, and denying Colmar's motion to amend to add a new affirmative defense.

**B**

Colmar contends that the District Court erred in not granting its motion for judgment as a matter of law because One Beacon, Millenium and AIG failed to prove necessary elements of their bailment claims. "In a bailment situation, the plaintiff makes a prima facie case for damages when he shows that the bailed property was delivered to the bailee in good condition and that it was damaged while it was in the care, custody, and control of bailee." *Parker v. Miracle Strip Boat & Motors Headquarters, Inc.*, 341 So. 2d 197, 198 (Fla. 1976); FLA. STAT. §§ 677.204 and 677.403 (2007).

> We review a district court's denial of a motion for judgment as a matter of law *de novo,* applying the same standards as the district court. In considering the sufficiency of the evidence that supports the jury's

11

verdict, we review the evidence "in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party." If reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions based on the evidence presented, the motion should be denied.

*Montgomery v. Noga*, 168 F.3d 1282, 1289 (11th Cir. 1999) (internal citation omitted).

## 1

Colmar contends that Millenium and AIG failed to produce sufficient evidence establishing their ownership of the damaged coffee beans. According to Colmar, correspondence and invoices that it sent to AIG's and Millenium's brokers fail to qualify as "documents of title" under the Florida Uniform Commercial Code, which defines the instrument as follows:

> "Document of title" includes bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers. To be a document of title a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

12

FLA. STAT. ANN. § 671.201(15) (West 2007). Thus, Colmar argues that Millenium and AIG failed to establish ownership by only producing correspondence and invoices that Colmar sent to their brokers. The District Court disagreed.

The record shows that Millenium and AIG were in the business of trading coffee, and, therefore, they were beneficial owners of lots of coffee held through independent brokers who had taken delivery of the commodity and stored it with Colmar. The brokers arranged for the purchase and storage of the coffee, held the warehouse receipts physically for the owners, and billed the owners for all costs associated with the broker efforts. It was industry practice for Millenium's and AIG's brokers to act as their agent with respect to the fees associated with coffee storage; thus, it would seem logical that documentation of the broker-coffee trader relationship and related fees should sufficiently establish legal ownership of the coffee.

Additionally, the Statement of Stipulated Facts that was read to the jury establishes that Millenium and AIG were corporations engaged in the coffee trade who stored bags of coffee in the warehouse. These stipulations are further bolstered by additional stipulations which set forth the agreements of the parties as to the additional costs incurred by Millenium and AIG as a result of damage to the

13

coffee. In light of this evidence, a juror could reasonably conclude that Millenium and AIG did indeed own the coffee.

**2**

Colmar also contends that One Beacon, Millenium and AIG failed to establish that a reasonable warehouseman would have acted differently under the circumstances. Under Florida law,

> [a] warehouseman is liable for damages for loss of or injury to the goods caused by his or her failure to exercise such care in regard to them as a reasonably careful person would exercise under like circumstances but unless otherwise agreed he or she is not liable for damages which could not have been avoided by the exercise of such care.

FLA. STAT. ANN. § 677.204(1) (West 2007).

Colmar stored perishable commodities in its facility. The warehouse was a ground level structure located in a low lying area that was prone to flooding. Evidence was presented that neighboring warehousemen, who were aware of the region's propensity for flooding, proactively placed perishables on more than one pallet to protect them from rising flood waters. Furthermore, as a member of the Coffee Exchange, Colmar had an affirmative duty to verify that the warehouse was in compliance with federal, state and local ordinances. That it failed to identify and remediate the truck wells that Cramco constructed – none of which possessed

14

the necessary pumps or drainage required under local building ordinances –

demonstrates a departure from the standard of care. Finally, when the storm hit

Miami, Colmar did nothing to protect the coffee in the warehouse from flooding.

In light of the facts presented by One Beacon, Millenium and AIG, reasonable and

fair-minded persons in the exercise of impartial judgment might reach different

conclusions regarding whether Colmar negligently breached the standard of care

for a diligent warehouseman. Therefore, the District Court did not err in denying

Colmar's motion for judgment as a matter of law.

**3**

Finally, Colmar alleges that even if the One Beacon, Millenium and AIG are

successful in establishing ownership of the coffee and breach of the reasonable

warehouse standard, they failed to provide sufficient evidence to establish that

Colmar's negligent acts were the actual and proximate cause of the damage to the

coffee beans. Colmar relies heavily upon its contention that the severe storm event

that caused the flooding constituted an "Act of God" and was therefore outside of

its control. Yet, Colmar's departures from the standard of care, such as storing the

coffee beans in a warehouse at ground level in an area of Miami that is prone to

flooding, failing to identify and remediate the truck wells that Cramco constructed

that did not possess the necessary pumps or drainage required under local building

15

ordinances, and failing to act in any way to protect the coffee beans from flooding in the warehouse when the storm hit Miami in October 2000, are sufficient to establish both the actual and legal cause of the coffee bean damage. We must review the evidence in the light most favorable to One Beacon, Millenium and AIG. *Montgomery*, 168 F.3d at 1289. Consequently, we conclude that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions based on the evidence presented that, but for Colmar's negligent acts, the flood waters would not have entered inside the warehouse and damaged One Beacon's, Millenium's and AIG's coffee. Therefore, the motion for judgment as a matter of law was appropriately denied.

## C

Colmar argues that the District Court abused its discretion in admitting irrelevant and highly prejudicial evidence concerning (1) the denial of a building permit for exterior truck wells at the warehouse because of concerns related to drainage; and (2) the installation of pumps in the truck wells by a subsequent tenant to prevent future flooding after Colmar had vacated the premises. "We review rulings on the admission of evidence and motions for new trial for abuse of discretion." *Ad-Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1463 (11th Cir. 1994). Abuse of discretion exists "if the

16

district court 'made a clear error of judgment . . . or . . . applied an incorrect legal standard.'" *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159 (11th Cir. 2004) (quoting *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1326 (11th Cir. 2000)).

Colmar contends that One Beacon, Millenium and AIG failed to present an adequate foundation to establish the relevancy and probative value of evidence regarding the denial of the building permit and the installation of pumps by a subsequent tenant. Specifically, Colmar alleges that establishing a code violation existed was a condition precedent to the admissibility of the building permit evidence. Colmar also maintains that foundational evidence that pumps would have prevented the severe flooding that occurred was necessary to admit evidence regarding Colmar's failure to install pumps.

Colmar was a member of the Coffee Exchange. According to the Coffee Exchange's rules, Colmar had an affirmative obligation to ensure that its storage facility was in compliance with federal, state, and local laws. The District Court admitted the evidence regarding the denial of the building permit for the exterior truck wells because "there is arguably, under the Exchange rules, a duty to -- of the tenant to be informed about what was being done to make sure the product inside the warehouse was safely handled in accordance with the rules." Since evidence

17

was presented that DERM denied Cramco's permit to construct the truck wells due to inadequate pumps and drains, such information was relevant to a determination of Colmar's negligence as a warehouseman. The District Court did not abuse its discretion in admitting the evidence of DERM's denial of the building permit.

Colmar also maintains that the District Court abused its discretion in admitting the testimony of the tenant who leased the warehouse from Colmar after it vacated the premises. The tenant testified that it had required Cramco to install new catch basins, pumps and drains in the facility's truck wells. Colmar contends that such testimony was inadmissible under Rule 407 of the Federal Rules of Evidence as a subsequent remedial measure. Rule 407 provides:

> When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This *rule* does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Rule 407 does not apply to a remedial measure that was taken without the voluntary participation of the defendant. *In re Aircrash in Bali, Indonesia*, 871 F.2d 812, 816-17 (9th Cir. 1989) (*per curiam*). *See also Mehojah v. Drummond*,

18

56 F.3d 1213, 1215 (10th Cir. 1995) (holding that Rule 407 "does not apply to subsequent remedial measures by non-defendants."); *TLT-Babcock, Inc. v. Emerson Elec.* Co., 33 F.3d 397, 400 (4th Cir. 1994) (holding that "evidence of subsequent repairs may be admitted where those repairs have been performed by someone other than the defendant."); *O'Dell v. Hercules, Inc.*, 904 F.2d 1194, 1204 (8th Cir. 1990) (holding that "[a]n exception to Rule 407 is recognized for evidence of remedial action . . . under taken by a third party"); *Dixon v. Int'l Harvester Co.,* 754 F.2d 573, 583 (5th Cir. 1985) (Rule 407 does not bar evidence of repairs made by a non-defendant); *Lolie v. Ohio Brass Co.*, 502 F.2d 741, 744 (7th Cir. 1974) (Rule 407 has no applicability "when the evidence is offered against a party . . . which did not make the changes.")  *Steele, Texas Emp. Ins. Ass'n, Intervenor v. Wiedemann Mach. Co.*, 280 F.2d 380, 382 (3d Cir. 1960) (holding the rule excluding evidence of repairs made after an accident is not applicable where the person who made the repairs is not a party to the suit).

The applicability of Rule 407 to repairs made by a non-defendant is a question of first impression in this Circuit.  Today, we join the seven Circuits that have agreed that such evidence is not barred.  Accordingly, we hold that the District Court did not abuse its discretion in admitting evidence of repairs to the warehouse made by a non-defendant.

19

**D**

Colmar argues that the jury's verdict with respect to damages was reasonable and should not have been disturbed by the District Court with a grant of additurs and a new trial. The District Court concluded that the jury's determination with respect to ancillary damages for One Beacon, Millenium and AIG was inappropriate in light of the stipulations by the parties. Additionally, the District Court held that new trials were necessary to determine the value of the coffee beans lost by One Beacon, Millenium and AIG because the jury verdict failed to conform to the evidence at trial. The District Court based this determination on the fact that "there [was] a genuine issue of fact as to the number of bags that were lost and damaged for One Beacon" and "[w]hile [AIG, Millenium and Colmar] stipulated as to the number of bags of coffee destroyed . . ., there is a genuine issue of fact as to the value of coffee per pound."

"'We review a district court's award of damages under a clearly erroneous standard.'" *Simmons v. Conger*, 86 F.3d 1080, 1084 (11th Cir. 1996) (quoting *Davis v. Marsh*, 807 F.2d 908, 913 (11th Cir. 1987). The granting of a new trial based upon alleged inadequacy of the verdict is reviewed for abuse of discretion. *Sentry Indem. Co. v. Peoples*, 856 F.2d 1479, 1481 (11th Cir. 1988).

Great American, Dornoch, and Colmar each stipulated to the value of the damaged coffee beans that were destroyed. Indeed, with respect to damages, page sixteen of the jury instructions specifically indicated that jurors should only "assess for the loss of the coffee lost for Millenium, AIG, and One Beacon." The jury ultimately awarded One Beacon, Millenium and AIG damages that were significantly less than the amounts stipulated to by the parties.

The Supreme Court held in *Dimick v. Schiedt*, 293 U.S. 474 (1935), that the Seventh Amendment prevents a court from increasing a jury's award or conditioning the denial of a new trial on the defendant's acquiescence to an additur. *Id.* at 486-87. "Courts recognize an exception to *Dimick* where the jury has found the underlying liability and there is no genuine issue as to the correct amount of damages." *U.S. E.E.O.C. v. Massey Yardley Chrysler Plymouth, Inc.,* 117 F.3d 1244, 1252 (11th Cir. 1997).

Although the parties stipulated to the number of bags of Millenium and AIG's coffee beans that were destroyed, there remained a genuine issue of fact as to the price per pound of Millenium, AIG, and One Beacon's coffee beans, and how many bags of One Beacon's coffee beans were lost or damaged. The stipulations were sufficient to support the District Court's grant of additur for ancillary damages; however, the same is not the case for actual damages. Indeed,

21

the District Court correctly recognized that a grant of additur with respect to actual damages was beyond its discretion. Accordingly, the District Court did not err in awarding additurs to AIG, Millenium, and One Beacon, and did not abuse its discretion in granting a new trial regarding actual damages.

**E**

Finally, Colmar argues that the District Court erred when it awarded One Beacon, Millenium and AIG the "unearned windfall" of prejudgment interest from October 4, 2000. "Whether a successful claimant is entitled to prejudgment interest is a question of state law[,]" subject to de novo review. *Venn v. St. Paul Fire & Marine Ins. Co.*, 99 F.3d 1058, 1066 (11th Cir. 1996).

Unfortunately, there is no Florida case law that we can cite in this diversity action wherein that state's courts have determined whether an insurer can recover pre-judgment interest as of the date of the loss to the insured. In *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985), the Florida Supreme Court held that "when a verdict liquidates damages on a plaintiff's out-of-pocket, pecuniary losses, plaintiff is entitled, as a matter of law, to prejudgment interest at the statutory rate from the date of that loss." *Id*. at 215. In *Argonaut*, the Florida Supreme Court did not indicate when the date of loss occurs.

22

In *National Fire Ins. Co. of Hartford v. Fortune Constr. Co.*, 320 F.3d 1260 (11th Cir. 2003), citing Florida law, this Court stated that "[w]here the judgment liquidates the plaintiff's damages, the plaintiff is entitled, as a matter of law, to prejudgment interest from the date of that loss." *Id*. at 1279. *National Fire* is not dispositive of the question before us. *National Fire* involved the application of the doctrine of equitable subrogation and not the date prejudgment interest is due as a matter of law.

In *National Fire*, an insurance company brought an action against a general contractor alleging assignment of the rights of a subcontractor to recover contract proceeds received by the general contractor that exceeded the costs of completion after the insured subcontractor abandoned completion of his construction projects. *Id*. at 1264-65. Thus, National Fire asserted its own right to repayment under the insurance (surety) contract it entered into with the subcontractor. In *National Fire*, this Court based its decision on the right to equitable subrogation. *Id.*

Colmar did not argue before the District Court that equitable considerations allowed it to disregard the actual date of loss to the insured under a subrogation contract. In a motion to alter or amend the judgment, Colmar argued that the award of prejudgment interest was a manifest injustice under Rule 59(e) of the Federal Rules of Civil Procedure because "it will have been deprived of its

23

constitutionally protected privileges to right to trial by jury and, moreover, pre-judgment interest has been assessed it in derogation of Florida law governing this issue." Colmar did not assert that it was entitled to equitable relief from the District Court's prejudgment interest order. "Arguments raised for the first time on appeal are not properly before this Court." *Hurley v. Moore*, 233 F.3d 1295, 1297 (11th Cir. 2000).

Turning to the question of law presented regarding the date prejudgment interest should be awarded to an insurer that has indemnified its insured pursuant to a subrogation agreement, under Florida law, "an insurer is entitled to be subrogated to any right of action which the insured has against third persons who caused the injury." *Schwab v. Town of Davie*, 492 So. 2d 708, 709 (Fla. Dist. Ct. App. 1986) (citing *Indiana Ins. Co. v. Collins*, 359 So. 2d 916 (Fla. Dist. Ct. App. 1978)). Because prejudgment interest from the date of loss is merely an element of pecuniary damages under Florida law, the right to prejudgment interest from the date of the insured's loss would logically appear to be part of the insured's claim that the insurer is entitled to under the subrogation and indemnification agreement. To the extent that an insured could have recovered prejudgment interest from the date of the flooding, its insurer can also recover from that date as well.

24

Therefore, the District Court did not err in awarding One Beacon, Millenium and AIG prejudgment interest from the date of their insureds' loss.

## CONCLUSION

We **AFFIRM** the decision of the District Court.

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I through III.D of the majority's opinion, but I respectfully dissent from Part III.E. In my view, prejudgment interest should be granted from the time that the insurance companies paid the claims, not from the date of the flood.

As an initial matter, I disagree with the majority's contention that appellant did not properly preserve its objection to the date of loss from which prejudgment interest is recoverable. In appellant Colmar's responses to the plaintiffs' motions for prejudgment interest, Colmar explicitly argued that prejudgment interest should only accrue from the date that the appellees paid their respective claims.

The seminal Florida case concerning prejudgment interest is, as the majority notes, Argonaut Ins. Co. v. May Plumbing Co., 474 So. 2d 212, 215 (Fla. 1985) (holding that prejudgment interest is compensation to make the party whole and should be calculated from the date of the loss). Argonaut, even though it is a subrogation claim, does not discuss how to determine when the date of loss occurs. The majority cites Schwab v. Town of Davie for the proposition that "an insurer is entitled to be subrogated to any right of action which the insured has against third persons who caused the injury." 492 So. 2d 708, 709 (Fla. Dist. Ct. App. 1986) (citing Indiana Ins. Co. v. Collins, 359 So 2d 916 (Fla. Dist. Ct. App. 1978).

Neither case, however, discusses prejudgment interest or how to calculate when the date of loss *for the insurer* occurs.

Although it appears that there is no Florida or Eleventh Circuit caselaw on point, there is extensive Florida caselaw making the right to recover prejudgment interest subject to equitable considerations. See Perdue Farms, Inc. v. Hook, 777 So. 2d 1047, 1054 (Fla. Dist. Ct. App. 2001) ("Depending on the equities of a given case, an award of prejudgment interest may be a windfall to the plaintiff and an unfair burden on the defendant."); Volkswagen of America, Inc. v. Smith, 690 So. 2d 1328, 1331 (Fla. Dist. Ct. App. 1997); Broward County v. Finlayson, 555 So. 2d 1211, 1213 (Fla. 1990) ("Interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable.") (quotations and citations omitted).

The two circuits that have addressed this issue have disagreed as to when prejudgment interest should accrue. The Second Circuit found that the general rule is that the insurer is entitled to all of the damages that the insured would be entitled to. Mitsui & Co. v. American Exp. Lines, Inc., 636 F.2d 807, 823-24 (2d Cir. 1981) (quoting Mobile & Montgomery Ry. Co. v. Jurey, 111 U.S. 584, 593-94 (1884). Alternatively, the Seventh Circuit has held that insurers can only recover

prejudgment interest from the time they have actually suffered a loss, i.e., paid on the claim. American Nat'l Fire Ins. Co. v. Yellow Freight Sys., Inc., 325 F.3d 924, 936-37 (7th Cir. 2003). The Seventh Circuit panel, while noting that generally the insurer steps into the shoes of the insured, argued that subrogees are only entitled to indemnification and thus are "entitled to indemnity to the extent only of the money actually paid...." Id. at 936 (quoting Maryland Cas. Co. v. Brown, 321 F. Supp. 309, 312 (N.D. Ga. 1971).

Because of Florida's clear policy of limiting prejudgment interest to prevent inequities, I believe that the better rule would be to limit recovery of prejudgment interest to the date that the insurers paid on the claim.

Not only does Florida's policy of limiting the recovery prejudgment interest to prevent windfall profits favor calculating the date of loss from the time the insurers paid their claim, but the Supreme Court of Florida's decision that a plaintiff cannot recover prejudgment interest from her loss unless she suffers actual, out-of-pocket damages also supports the later date of loss. In Alvarado v. Rice, Florida's Supreme Court denied the award of prejudgment interest to a plaintiff for her medical expenses because she had not actually paid those bills. 614 So. 2d 498 (Fla. 1993). The court expressly noted that if the plaintiff had paid her bills, she would be entitled to interest from the date she paid. Id. at 499-500.

28

This decision demonstrates the compensatory nature of prejudgment interest. It is available when costs were incurred, but not before.

Here, the appellees did not suffer a loss until they paid the insurance claims and thus would gain an inequitable windfall if they received prejudgment interest for the time before they paid on the policies. Therefore, I respectfully dissent from Part III.E of the opinion.