[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-12158

Non-Argument Calendar

_____

ARCH SPECIALTY INSURANCE COMPANY,

Plaintiff-Appellee,

*versus*

BP INVESTMENT PARTNERS, LLC,
d.b.a. The M Hotel,

Defendant-Appellant,

MICAH DAVID BASS,
individually,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:18-cv-01149-WWB-DCI

_____

Before WILSON, JILL PRYOR, and BRASHER, Circuit Judges.

PER CURIAM:

When a hotel owned and operated by appellant BP Investment Partners, LLC ("BPI") allegedly sustained extensive damage in a hurricane, BPI submitted a claim to its insurer, Arch Specialty Insurance Company. Arch investigated the claim and paid only a small portion of it. Arch refused to pay the remainder of the claim because it concluded that BPI had failed to fulfill its duty to cooperate with Arch's investigation and intentionally concealed or misrepresented material facts related to the claim.

Arch then filed a lawsuit against BPI seeking a declaration that it had no obligation to pay any additional amounts under the insurance policy and brought a claim under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201–501.213. The district court concluded that Arch failed to state a claim for relief under FDUTPA and dismissed that claim. The

declaratory judgment claim proceeded to trial, and a jury returned a verdict in Arch's favor.

Three issues are before us on this appeal. First, BPI argues that the district court erred when at trial it admitted into evidence transcripts from examinations under oath of Micah Bass, BPI's sole member. Second, BPI challenges the district court's denial of its motion to strike the entirety of witness Samuel Glicken's trial testimony. Third, BPI says that the district court erred in denying its motion to enter partial final judgment on the FDUTPA claim. After careful review, we conclude that (1) even assuming that the district court erred in admitting the transcripts of the examinations under oath, any error was harmless; (2) the district court did not abuse its discretion when it denied BPI's motion to strike Glicken's testimony; and (3) we lack appellate jurisdiction to review the denial of BPI's motion for entry of partial final judgment because the issue is moot. Accordingly, we affirm in part and dismiss in part.

I.

Before becoming involved in the hotel business, Bass—BPI's sole member—had a lengthy career repairing properties that were damaged in hurricanes and other storms. Bass formed BPI, which acquired a hotel in Orlando, Florida. The hotel, which operated under the name "M Hotel," was built in 1972 and had 167 guest rooms spread across several buildings.

In 2017, Hurricane Irma made landfall in Florida. According to BPI, the hurricane damaged all of the hotel's buildings and guest rooms as well as its pool. BPI submitted a claim to Arch.

Under the terms of the insurance policy, Arch was required to "pay for direct physical loss of or damage to" BPI's property. Doc. 1-2 at 25.[1] The policy placed on BPI certain responsibilities upon submitting a claim. BPI had to "[c]ooperate with [Arch] in the investigation . . . of the claim." *Id.* at 38. BPI also was required to "[t]ake all reasonable steps to protect the [property] from further damage," and, "if feasible, set the damaged property aside . . . for examination." *Id.* In addition, BPI agreed to permit Arch to "inspect the property . . . and examine [BPI's] books and records," as well as to "take samples of damaged and undamaged property for inspection, testing[,] and analysis." *Id.* The policy authorized Arch to "examine any insured under oath . . . about any matter relating to this insurance or the claim." *Id.* If BPI "intentionally conceal[ed] or misrepresent[ed] a material fact concerning . . . [a] claim," the policy stated that the coverage was "void." *Id.* at 100.

BPI submitted six proofs of loss[2] to Arch for the damages that the hotel allegedly sustained in the storm, seeking a total of approximately $8 million. In this section, we describe Arch's

---

[1] "Doc." numbers refer to the district court's docket entries.

[2] BPI submitted one proof of loss for each of its four buildings, one proof of loss for business interruption coverage, and one proof of loss for damage to ancillary equipment, including the pool and signs.

investigation of BPI's claim, which ultimately led the insurer to conclude that BPI had failed to fulfill its duties under the policy and had intentionally concealed or misrepresented material facts connected to the property and the claim. We then review the proceedings in this lawsuit, which Arch filed against BPI.

## A.

After receiving BPI's claim, Arch retained insurance adjuster Jeffrey Nonhof to investigate BPI's claim and determine what, if any, damage had been caused by the hurricane. About two weeks after the hurricane, Nonhof visited the property. He observed that it was "remarkably clean." Doc. 315 at 95. There were no uprooted trees or glass breakage. Although Nonhof saw no evidence that the storm damaged the hotel, he did observe that the property had been "poorly maintained." *Id.* When Nonhof spoke to Bass, Bass stated that he "clearly had a policy limits claim" and had "won the lottery." *Id.* at 104.

BPI hired World One Investments as the contractor to begin to clean up and repair the hotel after the storm. When Nonhof researched World One, he discovered that it was owned by Ernesto Escoto. Escoto was not a licensed contractor, but he had previously worked for Bass. Bass had other ties to World One: the company leased warehouse space from Bass for which it paid only $10 per month, well below the market rate.

When Nonhof and others working with him visited the hotel, they observed that BPI and World One had failed to protect the

property after the hurricane. World One threw away furniture from guestrooms, left other furniture and fixtures outside and un-protected where they were exposed to elements, tore out interior walls, and demolished guestrooms. World One also removed in-room air conditioning units from guest rooms, which resulted in the rooms having higher levels of moisture and made it more diffi-cult to determine the condition of the rooms immediately after the hurricane.

As part of the investigation, Nonhof requested that BPI pro-vide photographs or videotapes of the condition of the roof, the guestrooms, and the pool after the hurricane but before repairs were conducted. It received no materials in response to the re-quest.

BPI sought reimbursement from Arch for work that World One performed at the property. BPI submitted an invoice from World One reflecting charges for two security officers working around-the-clock at the hotel for approximately four months after the storm. Nonhof was suspicious of this invoice because when he visited the property, he saw, at most, one security guard present and only during normal business hours.

Eventually, BPI replaced World One with a new contractor, Southeastern Capital Partners of Orlando, LLC. Southeastern pre-pared additional estimates, which were provided to Arch, showing that it would cost millions of dollars to repair the hotel. As it turns out, Bass was a partial owner of Southeastern. Neither BPI nor Bass

told Arch that Bass was a part owner of the entity that prepared the estimates.

To get to the bottom of what caused the damage at the hotel, Arch ended up hiring multiple experts at a substantial cost. These experts ultimately concluded that most of the damage at the hotel existed prior to the hurricane and was the result of BPI's failure to maintain the property.

In the course of investigating BPI's claims, Arch conducted two examinations under oath of Bass. Nonhof attended both examinations. During these examinations, which were transcribed by a court reporter, Arch's attorney questioned Bass about BPI's claims. Although Bass could have had an attorney representing him at the examinations, he appeared without counsel.

During the examinations, Bass affirmed that BPI's proofs of loss were "true and accurate." Doc. 161-19 at 12. He stated that before the hurricane, he was not aware of any leaks in the hotel's roofs or windows. He also denied knowing of any leaks associated with the hotel's in-room air conditioning units or its bathrooms. And he said that there were no plans prior to the storm to refurbish the pool.

Nonhof believed these statements were false. Before the hurricane, state inspectors had warned BPI that the hotel's roofs, windows, and in-room air conditioning units were leaking. And although Bass denied that BPI had previously planned to refurbish the

pool, before the storm BPI told a state agency that it would soon be refurbishing the pool.

During the examinations, Arch asked Bass about invoices and estimates for the repairs to the hotel. Bass stated that Alex Juras, a World One employee, had prepared the estimates. Arch asked Bass when he first met Juras. Bass responded that he first met Juras when Juras "started working on this project about a month ago, a month and a half." *Id.* at 49. Bass failed to mention that Juras was his second cousin who had been living with him.

To the first examination, Bass brought with him documentation, which he shared with Arch. Some of the documents appeared to be copies of BPI's proof of loss forms. When Bass brought out these documents, the court reporter labeled them as exhibits. Arch's attorney remarked that the exhibits appeared to be different from the proof of loss forms that BPI had submitted to Arch. At that point, Bass snatched back the documents, ripped them into small pieces, and placed the pieces in his backpack.

Nonhof completed his investigation and concluded that BPI had violated the concealment, misrepresentation, or fraud provision of the policy. Because Arch concluded that BPI sustained no more than $400,000 in damage from the hurricane, it paid only this portion of the claim.

## B.

Arch then filed this action. It asserted a claim for declaratory judgment against BPI and a claim under FDUTPA against BPI and

Bass. In the declaratory judgment count, Arch asked the court to declare that it had no obligation to pay any additional amounts to BPI under the policy. In the FDUTPA claim, Arch alleged that BPI and Bass were liable to it because they "engaged in unconscionable acts and practices, and unfair and deceptive acts and practices in the conduct of trade or commerce." Doc. 1 at ¶ 49.

BPI and Bass moved to dismiss the FDUTPA claim, arguing that Arch had failed to state a claim for relief. The district court agreed and dismissed the claim with prejudice.

After the district court dismissed the FDUTPA claim, BPI and Bass filed a motion requesting that the court enter a partial final judgment with respect to the claim. Under Florida law, after judgment is entered and all appeals are exhausted, a court "may award" the prevailing party on a FDUTPA claim reasonable attorney's fees and costs. Fla. Stat. § 501.2105(1). BPI and Bass requested that the court enter a partial final judgment on the FDUTPA claim and award them attorney's fees. The district court denied the motion, concluding that BPI and Bass had failed to comply with a local rule. *See* S.D. Fla. R. 3.01(a) (requiring all motions to contain "a concise statement of the precise relief requested, a statement of the basis for the request, and a memorandum of legal authority in support of the request").

BPI and Arch continued to litigate the declaratory judgment claim, which was tried before a jury. Arch called a number of witnesses at trial, including experts it had hired. Arch's witnesses also included Samuel Glicken, an adjuster BPI had initially hired in

connection with its claim, and Nonhof. We discuss Glicken's and Nonhof's testimony in greater detail.

Glicken testified that he was a public adjuster, a licensed professional who acts as an advocate for the insured. Shortly after the hurricane, BPI hired Glicken. But the relationship did not last long. When Glicken inspected the property, he observed that "[t]he damage just looked weird." Doc. 315 at 195. It "just didn't make sense" to him that all the damage BPI was claiming could have been caused by the hurricane. *Id.* at 196. Concerned that BPI's claim was fraudulent, Glicken said, he resigned as its public adjuster.

BPI disputed that Glicken had resigned. It claimed that Bass had actually fired Glicken. On cross examination, BPI asked Glicken whether he would be "surprised" if Bass had "something different to say about [their] relationship." *Id.* at 202. Glicken responded, "I wouldn't be surprised by anything he has to say." *Id.*

On redirect, Arch asked Glicken to explain why he would not be surprised by anything Bass had to say. Glicken began to answer by describing something that he heard from a friend; BPI raised a hearsay objection. The court sustained the objection. Arch then asked Glicken to explain, without relying on hearsay, why he would not be surprised by anything Bass had to say. Glicken answered, "[a]pparently there was past fraudulent activity that can be looked at on Google." *Id.* at 206. BPI objected and moved for a mistrial. The court struck Glicken's statement and immediately instructed the jury to disregard it.

Outside the presence of the jury, the court offered BPI the opportunity to draft a curative instruction. BPI argued that the only possible cure was to strike all of Glicken's testimony, and it renewed its request for a mistrial. The court declined to strike the entirety of the testimony but agreed to give a generic curative instruction to avoid drawing further attention to Glicken's stricken statement. The court took the motion for a mistrial under advisement. At the conclusion of the trial, the court instructed the jury that during the trial it had "sustained objections and disallowed certain testimony or other evidence by striking it and ordering you to disregard or ignore it. That means you must not consider that testimony or other evidence when you are deciding the case." Doc. 335 at 203.

In Nonhof's testimony, he told the jury about his investigation of BPI's claim. He described what he observed when he inspected the hotel and how BPI's actions complicated the investigation of the claim. Nonhof also testified about what he observed during the examinations under oath of Bass. He told the jury how Bass, after giving copies of the proof of loss forms to the court reporter, took back the documents and ripped them into pieces.

Nonhof identified several misrepresentations that he believed Bass made during the examinations. Nonhof testified that these misrepresentations included Bass's statements that: he had no prior relationship with Juras; he had no knowledge of any leaks in the hotel's roofs, windows, or in-room air conditioning units

prior to the storm; and BPI had no plans to refurbish the hotel's pool prior to the storm.

Through Nonhof, Arch sought to introduce into evidence the transcripts from Bass's examinations under oath. BPI objected, but the court overruled the objection, and the transcripts were admitted into evidence.

In its closing argument, Arch argued that Bass had been dishonest "throughout this entire process." *Id.* at 123. According to Arch, the hotel did not suffer extensive damage during the hurricane; instead, any damage was the result of the hotel being poorly maintained and "years and years of water damage." *Id.* at 132. In its closing argument, Arch never mentioned Glicken or his testimony. It did reference the transcripts of Bass's examinations under oath. Arch cited the pages of the transcripts in which Bass destroyed the copies of BPI's proofs of loss and answered questions about his relationship with Juras.

The jury deliberated for about 90 minutes. While deliberating, the jury asked the one question of the court: where in the transcripts of the examinations under oath had Arch asked Bass about his affiliation with Juras? The court identified for the jury the relevant pages.

The jury returned a verdict finding that BPI "intentionally misrepresented or concealed a material fact or circumstance" regarding the hotel or its claim. *Id.* at 220. The jury also found that BPI "materially breached its post-loss duties." *Id.* After the jury

returned its verdict, the district court directed the clerk to enter a judgment in favor of Arch on the declaratory judgment claim, noting that the FDUTPA claim had previously been dismissed with prejudice. The clerk entered the judgment. BPI filed a notice of appeal.

BPI filed several post-trial motions including a motion for a new trial and a renewed motion for judgment as a matter of law. The district court denied these motions. In the same order, the court denied the motion for mistrial that the court had previously taken under advisement. After the district court entered the order, BPI did not file a new or amended notice of appeal.

## II.

On appeal, BPI challenges a number of the district court's rulings, including the rulings: (1) admitting into evidence the transcripts of Bass's examinations under oath; (2) denying BPI's motion to strike Glicken's entire trial testimony; (3) denying BPI's motion for a mistrial; (4) denying BPI's motion for a new trial; (5) denying BPI's renewed motion for judgment as a matter of law; and (6) denying BPI's motion for partial final judgment on the FDUTPA claim. We previously determined that we lacked jurisdiction to review the district court's order denying BPI's motion for a new trial, renewed motion for judgment as a matter of law, and motion for a mistrial because BPI failed to file a new or amended notice of appeal within 30 days of the district court's order denying these motions. The only issues that remain before us are whether the district court erred in: (1) admitting into evidence

the transcripts of Bass's examinations under oath, (2) denying BPI's motion to strike Glicken's entire testimony, and (3) denying the motion for partial final judgment. We address each issue in turn.

## A.

We begin with whether the district court erred in admitting into evidence the transcripts of Bass's examination under oath. Bass argues that the transcripts should not have been admitted as evidence because they contained hearsay. Even assuming that the district court erred in admitting the transcripts, we conclude that any error was harmless.

"We review rulings on the admission of evidence . . . for abuse of discretion." *Millennium Partners, L.P. v. Colmar Storage, LLC*, 494 F.3d 1293, 1301 (11th Cir. 2007) (internal quotation marks omitted). An abuse of discretion arises when the district court's decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *United States v. Gamory*, 635 F.3d 480, 492 (11th Cir. 2011) (internal quotation marks omitted)).

But even when a district court "abuses its discretion in admitting evidence, we may still find the error harmless." *Sovereign Mil. Hospitaller Ord. v. Fla. Priory of Knights Hospitallers of Sovereign Ord.*, 702 F.3d 1279, 1295 (11th Cir. 2012) (internal quotation marks omitted). "An evidentiary error is harmless if sufficient evidence uninfected by any error supports the verdict, and the error did not have substantial influence on the outcome of the case." *Id.*

(internal quotation marks omitted). When the erroneously admitted evidence was "merely cumulative of other evidence" that was properly admitted, the error was harmless. *See Drew P. v. Clarke Cnty. Sch. Dist.*, 877 F.2d 927, 931–32 (11th Cir. 1989).

Even assuming that the district court erred in admitting the transcripts of Bass's examinations under oath because the exhibits included hearsay,[3] any error was harmless. BPI argues that it was prejudiced by the court's admission into evidence of the portions of the transcript showing that Bass destroyed copies of the proofs of claim and where he denied having a pre-existing relationship with Juras. But these portions of the transcripts were cumulative of other evidence admitted at trial. Nonhof testified in detail about what he observed during the examination, describing both Bass's destruction of evidence and the answers that Bass gave about his relationship with Juras.[4] Accordingly, we conclude that any error in admitting the transcripts was harmless.[5]

---

[3] We also assume for purposes of this appeal that BPI adequately raised the hearsay objection at trial.

[4] BPI did not object to Nonhof's testimony describing his observations of Bass's behavior or the answers that Bass gave during the examination about his relationship with Juras.

[5] The examinations under oath covered other topics as well. We doubt that BPI adequately raised on appeal any argument that the district court erred in admitting into evidence other portions of the transcripts, but even assuming it did, any error was harmless. *See Sovereign Mil. Hospitaller Ord.*, 702 F.3d at 1295.

## B.

The second issue before us is whether the district court abused its discretion when it refused to strike the entirety of Glicken's testimony. We review for abuse of discretion the district court's refusal to strike testimony. *See Direct Niche, LLC v. Via Varejo S/A*, 898 F.3d 1144, 1151 n.5 (11th Cir. 2018).

Glicken testified that there was information on the internet showing that Bass engaged in fraudulent activity on other occasions. Although this testimony was prejudicial, the district court gave a curative instruction that "rendered harmless" Glicken's prejudicial remark. *United States v. Simon*, 964 F.2d 1082, 1087 (11th Cir. 1992) (internal quotation marks omitted). BPI argues that the district court's instruction was improper because "the only chance at curing" Glicken's prejudicial statement was to strike his entire testimony. Appellant's Br. at 28. We disagree. As we have previously explained, "[a] curative instruction purges the taint of a prejudicial remark because a jury is presumed to follow jury instructions." *Simon*, 964 F.2d at 1087 (internal quotation marks omitted). We thus cannot say that the district court abused its discretion when it gave a curative instruction instead of striking the entirety of Glicken's testimony.[6]

---

[6] BPI also argues that the district court erred in denying its motion for a new mistrial and its motion for a new trial because the curative instruction was inadequate. But as we explained above, we lack jurisdiction to review the district court's denial of these motions.

## C.

The third issue we address is whether the district court erred when it denied BPI's motion for entry of a partial final judgment. Because we conclude that this issue is moot, we dismiss this portion of BPI's appeal.

When an action involves more than one claim for relief, a district court has discretion to "direct entry of a final judgment as to one or more, but fewer than all, claims . . . if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). After the district court dismissed the FDUTPA claim, BPI and Bass filed a motion asking the court to enter a partial final judgment on that claim. The district court denied the motion on the ground that BPI and Bass failed to comply with a local rule.

On appeal, BPI argues that the district court erred in finding that it failed to comply with the local rule. It argues that the district court should have entered a final judgment in its favor on the FDUTPA claim. BPI asks us to remand the case to the district court "with directions to enter a final judgment in [its] favor on the FDUTPA claim." Appellant's Br. at 37.

Although the parties have not raised any question about whether this issue is moot, "we have an obligation to notice and decide mootness issues." *United States v. Sec'y, Fla. Dep't. of Corrs.*, 778 F.3d 1223, 1226 (11th Cir. 2015). Here, the relief that BPI seeks on appeal is a final judgment on the FDUTPA claim. But the district court, after trial, entered a final judgment in this case,

which necessarily encompassed the earlier interlocutory order dismissing the FDUTPA claim. *See Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins.*, 953 F.3d 707, 725 (11th Cir. 2020) (explaining that earlier interlocutory order dismissing some, but not all claims, merges into final judgment). Because there is already a final judgment in this case, it is impossible for us to give BPI "meaningful relief" on this portion of the appeal. *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001). We thus conclude that this portion of the appeal is moot and must be dismissed. *See id.*

## III.

For the reasons set forth above, we affirm in part and dismiss in part.

**AFFIRMED IN PART, DISMISSED IN PART.**