[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15101
_____

D.C. Docket No. 9:09-cv-81008-KLR


SOVEREIGN MILITARY HOSPITALLER ORDER OF
SAINT JOHN OF JERUSALEM OF RHODES AND OF MALTA,

Plaintiff - Counter
Defendant - Appellant,

versus

THE FLORIDA PRIORY OF THE KNIGHTS HOSPITALLERS OF THE
SOVEREIGN ORDER OF SAINT JOHN OF JERUSALEM, KNIGHTS
OF MALTA, THE ECUMENICAL ORDER,

Defendant - Counter
Claimant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 18, 2012)

Before WILSON, PRYOR, and MARTIN, Circuit Judges.

WILSON, Circuit Judge:

We *sua sponte* vacate and reconsider our original opinion in this matter. We substitute the following opinion for our original opinion.

Plaintiff-Appellant Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes and of Malta (Plaintiff Order) is a religious order of the Roman Catholic Church that undertakes charitable work internationally. Defendant-Appellee The Florida Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, The Ecumenical Order (The Florida Priory) is also a charitable organization, having an expressly ecumenical, rather than Catholic, association. Although The Florida Priory incorporated in Florida in 2005, it is associated with a parent organization, Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, the Ecumenical Order (The Ecumenical Order), which was first incorporated in the United States in 1911. The Ecumenical Order is not associated with the Catholic Church, although approximately sixty percent of its members are Catholic.

Plaintiff Order filed suit against The Florida Priory in July of 2009 asserting infringement and false advertising claims under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, as well as state law claims for unfair competition and violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201

2

*et seq.* The infringement claims were based on The Florida Priory's alleged use of marks that are confusingly similar to those for which Plaintiff Order has obtained federal registrations. In the false advertising claim, Plaintiff Order charged that The Florida Priory (through its parent) falsely claimed a historic affiliation with Plaintiff Order going back to the eleventh century. The state law claims derive from these same allegations. The Florida Priory counterclaimed, alleging that Plaintiff Order committed fraud on the United States Patent and Trademark Office (PTO) in applying for its service marks due to Plaintiff Order's failure to disclose its knowledge of the domestic presence of other organizations that used similar marks in commerce.

The district court ruled in favor of The Florida Priory on all counts of Plaintiff Order's complaint and The Florida Priory's counterclaim. This appeal followed, and after thorough consideration, we affirm in part, reverse in part, and vacate in part the judgment below and remand for further proceedings.

## I.    Facts and Procedural History

Starting on February 28, 2011, the district court held a three-day bench trial on the claims and counterclaims asserted by the parties. The vast majority of testimony related to the histories of the organizations involved, including The Ecumenical Order. Because of the fact-intensive nature of this case, we

summarize the trial proceedings and the resulting findings of fact and conclusions of law by the district court, which were reported in a published opinion. *See Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes and of Malta v. The Fla. Priory of Knights Hospitallers of the Sovereign Order of St. John of Jerusalem, Knights of Malta, The Ecumenical Order*, 816 F. Supp. 2d 1290 (S.D. Fla. 2011).

### A.    *Plaintiff Order's History and Service Mark Registrations*

#### 1.    Trial Testimony Regarding History

As part of its case, Plaintiff Order presented the testimony of Geoffrey Gamble, a representative of Plaintiff Order, and Dr. Theresa Vann, an expert historian, to trace the history of Plaintiff Order from its founding to present. According to these witnesses, Plaintiff Order was founded in Jerusalem in the eleventh century. (D.E. 144, 37:11–12.) It relocated to the City of Acre and later to the island of Rhodes, where it was known as the Knights of Rhodes. (*Id.* at 37:12–16.) After spending about two hundred years on the island of Rhodes, the group located in Malta (becoming the Order of Malta), which had been ceded for the Order's use by Emperor Charles V. (*Id.* at 37:16–18.) Organizationally, multiple priories—a term which Gamble explained references canonical religious

4

bodies where people are housed, (*id.* at 48:25–49:1)—existed across Europe.[1]  At some point there existed priories in Poland, Bavaria, and England, though the Polish priory had been lost when Poland was partitioned.  (D.E. 145,110:12–18.)

Around 1797 or 1798, the Order of Malta was suffering financial hardship and sought monetary support from Czar Paul I of Russia.  (*Id.* at 108:20–109:3.) Two knights went to Russia seeking to obtain the property of the former Polish priory, and out of this visit came an agreement to create a Catholic-affiliated Russian priory.  (*Id.* at 110:25–111:9.)

In 1798, Napoleon expelled the Order of Malta and its knights from the island of Malta, and the organization relocated to present-day Italy.  (D.E. 144, 37:17–19; D.E. 145, 111:13–25.)[2]  The Order of Malta's Grand Master at the time, Ferdinand von Hompesch zu Bolheim, wrote to Czar Paul I for support after this expulsion.  (D.E. 145, 111:12–18.)  Czar Paul I, in response to the request for assistance and "for reasons best known to himself," created a non-Catholic order for the non-Catholic members of his court.  (*Id.* at 112:6–10.)   What happened next forms the crux of both parties' historical arguments.  Plaintiff Order contends

---

[1] Depending on the size, these bodies could be classified as sub-priories, priories, or a grand priory.  (D.E. 114, 49:6–10.)

[2] Dr. Vann testified that many of the Knights of Malta returned to their homeland, but she was unsure of how many (if any) specifically fled to Russia.  (D.E. 145, 112:1–4.)

that the Czar illegitimately declared himself Grand Master[3] of the entire Order, commencing a short-lived usurpation that ended with his assassination in 1801. (*Id.* at 112:8–21.)  The Czar's heir, Alexander I, took no interest in the Order's work.

In the early 1800s, the two Russian priories, along with the other European priories, elected Giovanni Battista Tomassi as Grand Master.  (*Id.* at 118:16–19.) Eventually, Czar Alexander I stripped both Russian priories of their land.  (*Id.* at 115:6–8, 116:15–22.)

Grand Master Tomassi served for only several years, and the next Grand Master was not confirmed by the Pope until 1879.  (*Id.* at 123:3–7.)  The title of Grand Master was in abeyance for that period because of the warfare in Europe and, importantly, because Plaintiff Order was without land, a headquarters, or revenue.  (*Id.* at 121:16–122:16.)  Plaintiff Order utilized that interim period to redefine its responsibilities and focus on its hospitaller, rather than its military, activities.  (*Id.* at 119:24–120:5, 122:18–23.)  Likewise, over the past century, Plaintiff Order has served to provide hospital accommodations and serve as a religious order of the Catholic Church.  (*Id.* at 124:3–6.)  It is currently headquartered in Rome.  (*Id.*)

---

[3] Gamble and Dr. Vann testified that this was a de facto title, since Czar Paul I did not meet any of the requirements to be Grand Master.  (D.E. 145, 112:20–113:7.)

Plaintiff Order began operating in the United States in 1926 or 1927 when it established the American Association in New York. (D.E. 144, 90:11–12.) Later, Plaintiff Order established the Western Association, based in San Francisco, and the Federal Association, based in Washington, D.C. (*Id.* at 106:7–9, 107:8–10.) There are about three thousand Knights and Dames of Plaintiff Order within the United States. (*Id.* at 190:23.)

### 2. Service Mark Registrations

Plaintiff Order has obtained the following registrations for its service marks:

| Registration No. | Mark | First Use in Commerce Date | Registration Date |
|---|---|---|---|
| 2,799,898 | | 12/31/1926 | 12/30/2003 |
| 2,783,933 | SOVEREIGN MILITARY HOSPITALLER ORDER OF ST. JOHN OF JERUSALEM OF RHODES AND OF MALTA | 12/31/1926 | 11/18/2003 |
| 2,783,934 | KNIGHTS OF MALTA | 12/31/1926 | 11/18/2003 |
| 2,915,824 | HOSPITALLERS OF ST. JOHN OF JERUSALEM | 4/28/1927 | 1/4/2005 |

7

| 3,056,803 | ORDER OF ST. JOHN OF JERUSALEM | 4/28/1927 | 2/7/2006 |

The applications for these service marks were executed by Dean Francis Pace, a member of Plaintiff Order. He attested on each application that he was authorized to execute the application, that he believed Plaintiff Order to be the owner of the specific mark, that he believed Plaintiff Order was entitled to use the mark in commerce, and that to the best of his knowledge no other entity had the right to use a similar mark. (D.E. 127-2, 69, 86–87.) After some back and forth with the PTO,[4] Plaintiff Order's marks were registered.

### B. The Florida Priory's History and Relevant Service Mark Registrations

#### 1. Trial Testimony Regarding History

The Florida Priory's account of history mirrors Plaintiff Order's up until 1798. The Florida Priory disputes Plaintiff Order's characterization of Czar Paul I as a de facto Grand Master. Instead, The Florida Priory argued that the Czar became a de jure Grand Master, establishing a continuous interdenominational Order that persisted all the way to the point where Grand Duke Alexander of

---

[4] The examining attorney of the PTO found a collective membership mark previously registered by an affiliate of The Ecumenical Order. (D.E. 127-2, 76–77.) Plaintiff Order was able to distinguish that mark and successfully register its service marks.

Russia accepted the title of Grand Master in 1913 at the Waldorf-Astoria Hotel in New York City. (D.E. 146, 25:3–16, 33:6–12); (D.E. 25-11, 16). It was not, of course, the district court's obligation to rule on the legitimacy of Czar Paul I's title, in much the same way that no Article III court could be asked to rule on the propriety of King Henry VIII's declaration of independence from the Vatican. *See* Act of Supremacy, 1534, 26 Hen. VIII, c. 1 (Eng.).

In January of 1911, The Ecumenical Order incorporated in New Jersey under the name "The Knights of Malta, Inc." (the New Jersey Corporation).[5] (D.E. 25-1, Exh. 2; D.E. 146, 40:2–9.) A companion and successor organization to the New Jersey Corporation was formed in Delaware in August of 1956 under the name "Sovereign Order of Saint John of Jerusalem, Inc." (the Delaware Corporation). (D.E. 25-1, Exh. 3; D.E. 146, 37:7–10; 75:17–25.) The late 1970s brought turmoil to the group, and in 1981, The Ecumenical Order severed ties with the leadership of the Delaware Corporation. (D.E. 146, 47:16–51:25.) The Ecumenical Order raises funds and undertakes charitable activities notwithstanding its present unincorporated status. Approximately sixty percent of The Ecumenical Order's members are Catholic. (D.E. 145, 24:22–23.)

The Florida Priory began operating as early as 1977. (D.E. 146, 7:1, 47:22–

---

[5] This corporation was administratively dissolved in 1989.

48:3.) The Florida Priory has used the marks of its parent, The Ecumenical Order, since its founding. In 2005, The Florida Priory incorporated in Florida, (*id.* at 7:9), and its principal place of business is located in West Palm Beach.

2.     Service Mark Registrations

In 1958, The Ecumenical Order (acting through the Delaware Corporation) obtained Registration No. 659,477, "SOVEREIGN ORDER OF SAINT JOHN OF JERUSALEM KNIGHTS OF MALTA," as a collective membership mark, which indicates membership in an organization. This registration reflects that the collective membership mark was first used in commerce in January 1911. This registration remains active today.[6]

C.     *Purported Communications Between The Ecumenical Order and Plaintiff Order*

The Florida Priory submitted three specific instances of communication among members of Plaintiff Order and The Ecumenical Order.[7] First, in

---

[6] Although two of Plaintiff Order's American groups petitioned to cancel this collective membership mark in the 1980s, that petition was dismissed with prejudice upon its withdrawal by the petitioning parties. (D.E. 25-3, Exh. 8.)

[7] These three correspondences are in the record in support of The Florida Priory's motion for summary judgment on Plaintiff Order's claims. The district court relied on them largely to support The Florida Priory's claim of fraud on the PTO. Some of these documents—particularly the letter from Guy Stair Sainty—are simply printouts from the Internet and, therefore, of questionable veracity. Nevertheless, we include them in the recitation of facts because, even if we consider them to be accurate depictions of the truth, they are insufficient to sustain a claim of fraud on the PTO, as discussed later.

10

November 1983, Grand Chancellor Thorbjorn Wiklund of The Ecumenical Order sent a letter on the organization's letterhead to Plaintiff Order's Rome headquarters. (D.E. 25-3, Exh. 7.) Through this letter, Wiklund alerted Plaintiff Order to a trademark dispute involving a corporation that registered a similar name in October 1979. (*Id.*) The letter requested assistance from Plaintiff Order in helping to stop the activities of the newly registered organization. (*Id.*)

Second, in April 2000, Guy Stair Sainty, a current member of Plaintiff Order, appears to have sent a letter to a member of The Ecumenical Order named Rick Joyner. (D.E. 26-1, 6–8.) Stair Sainty is presently a member of Plaintiff Order and serves on its committee on false orders. He is also the author of "The Self-Styled Orders of Saint John," a publication in which he mentions the existence of The Ecumenical Order. (*Id.*) Joyner, an author himself, has previously written *Courage that Changed the World: The Extraordinary History of the Knights of St. John*, which promotes The Ecumenical Order and its history. (*Id.* at 1–6.) Stair Sainty's letter, sent after he came across Joyner's book, informed Joyner that The Ecumenical Order is a modern-day invention with no connection to the eleventh century order (of which the only legitimate successor is Plaintiff Order). (*Id.* at 7.) Stair Sainty also included with the letter a copy of his publication in hopes of correcting Joyner's perception of history. (*Id.*) At the time the letter was sent in

11

2000, Stair Sainty was not a member of Plaintiff Order. (D.E. 144, 208:8–14; D.E. 146, 152:12–15.)

In July 2000, Chancellor Prince Boudewijn de Merode, a member of Plaintiff Order, wrote a letter to Joseph Frendo Cumbo, former Prince Grand Master of The Ecumenical Order. (D.E. 25-7, Exh. 13.) Cumbo was Papanicolaou's predecessor and, in the letter, it was apparently acknowledged that The Ecumenical Order could dub knights. (*Id.*)[8]

### D. The District Court's Ruling

#### 1. Findings of Fact

The district court's findings of fact recounted the histories of Plaintiff Order, The Ecumenical Order, and The Florida Priory. Most significant for this appeal, the district court found that up until 1798, Plaintiff Order and The Ecumenical Order shared a history through a common predecessor. *Sovereign Military Hospitaller*, 816 F. Supp. 2d at 1293–94 & n.1. Upon Napoleon's invasion of Malta, the knights scattered, and some of them ended up in Russia. *Id.* at 1293. There, both a Catholic order and a non-Catholic order were established, and this is where the groups diverge. *Id.* at 1294. The Catholic Order in Russia is the

---

[8] The original letter is written in Dutch, and following its entry in the record is an unverified translation of its contents. Again, we assume this is an accurate translation because, accepting it as true, it still does not help to establish The Florida Priory's claim of fraud.

predecessor to Plaintiff Order, and the non-Catholic order is the predecessor to The

Ecumenical Order (and, in turn, The Florida Priory). *Id.*

### 2. Conclusions of Law

The district court first examined The Florida Priory's claim of fraud on the

PTO. The district court canceled four of Plaintiff Order's service mark

registrations[9] based on its finding that Plaintiff Order committed fraud in executing

the oath that accompanies the federal registration applications. *Sovereign Military*

*Hospitaller*, 816 F. Supp. 2d at 1299–1300. Specifically, the district court found

that Plaintiff Order was aware of the domestic presence of The Ecumenical Order

since as early as 1983 but failed to disclose that fact in its applications. *Id.* at 1300.

Next, the district court considered the Lanham Act claims, beginning with

the infringement allegation. Because four marks had been canceled for fraud, this

required only an examination of Plaintiff Order's design mark, Registration No.

2,799,898. The district court found that Plaintiff Order's registered mark was

visually dissimilar from The Florida Priory's mark and, therefore, ruled there was

no likelihood of confusion between the two. *Id.* at 1301. Regarding the false

advertising claim, the district court decided that The Florida Priory could not be

---

[9] These marks were Registration Nos. 2,783,933 ("SOVEREIGN MILITARY HOSPITALLER ORDER OF ST. JOHN OF JERUSALEM OF RHODES AND OF MALTA"); 2,783,934 ("KNIGHTS OF MALTA"); 2,915,824 ("HOSPITALLERS OF ST. JOHN OF JERUSALEM"); and 3,056,803 ("ORDER OF ST. JOHN OF JERUSALEM").

13

held liable for false statements based on two reasons: (1) because it did, in fact, share a pre-1798 history with Plaintiff Order; and (2) because "the Florida Priory expressly associates itself with the Ecumenical Order, a non-Catholic organization." *Id.* at 1301–02.

On the state law claims, the district court evaluated the unfair competition claims with regard to the marks it had canceled and found no likelihood of confusion. *Id.* at 1302. Because it found no likelihood of confusion between either of the parties' marks and no merit to the false advertising claim, the district court denied Plaintiff Order's FDUTPA claim. *Id.* at 1303.

## II. Standard of Review

"After a bench trial, we review the district court's conclusions of law *de novo* and the district court's factual findings for clear error." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230 (11th Cir. 2009). Specifically, we review for clear error the district court's findings that a mark was procured by fraud, *Citibank, N.A. v. Citibanc Grp., Inc.*, 724 F.2d 1540, 1544 (11th Cir. 1984), and that two marks are not likely to be confused, *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 325 & n.2 (11th Cir. 1989). In the context of a false advertising claim, we similarly review for clear error the district court's conclusion that a statement is not false. *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1309 (11th Cir. 2010).

14

## III.    Discussion

Plaintiff Order raises multiple issues on appeal.  First, it contests the cancellation of four registered service marks, which the district court found were procured by fraud.  Plaintiff Order also contends that the district court committed reversible error in evaluating the merits of its Lanham Act infringement and false advertising claims, as well as its state law claims.  We address each in turn.

### A.      Fraud on the PTO

At any time, a party may petition to cancel a registered mark on the ground that the registration was procured by fraud, even if that mark has become incontestable.  15 U.S.C. §§ 1064(3), 1119.  An applicant commits fraud when he "knowingly makes false, material representations of fact in connection with an application for a registered mark." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008).  Fraud further requires a purpose or intent to deceive the PTO in the application for the mark. *In re Bose Corp.*, 580 F.3d 1240, 1243, 1245 (Fed. Cir. 2009); *see also Angel Flight*, 522 F.3d at 1210–11 (affirming cancellation on the basis of the applicant's purposeful failure to disclose a superior user of the mark).  The party seeking cancellation on the basis of fraud must prove its claim by clear and convincing evidence. *Angel Flight*, 522 F.3d at 1209.  This is necessarily a heavy burden, and "any doubt must be resolved

15

against the charging party." *Bose*, 580 F.3d at 1243.

The district court found that Plaintiff Order committed fraud on the PTO through execution of the oath that accompanies a service mark application, which requires the applicant's representative—in this case Dean Francis Pace—to attest to the following:

> The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. § 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

(D.E. 127-2, 37); *see also* 15 U.S.C. § 1051(a)(3) (setting forth the applicant's verification requirements); 6 McCarthy on Trademarks § 31:75 (4th ed. 2012) ("The type of fraud allegation that has given rise to the largest number of cases is the charge that registrant signed the application oath knowing of use of the mark by others. . . . While such charges of fraud and nondisclosure have uniformly been rejected, litigants continue to pursue them vigorously . . . ."). The district court

explained that Pace was *personally unaware* of the existence of The Ecumenical Order at the time he signed the applications and the accompanying oath. *Sovereign Military Hospitaller*, 816 F. Supp. 2d at 1298, 1300.

Nonetheless, the district court canceled Plaintiff Order's registered word marks based on Plaintiff Order's failure to disclose the existence of The Ecumenical Order to the PTO. According to the district court, Plaintiff Order knew of The Ecumenical Order's domestic presence as early as 1983 and had a duty to disclose that fact in the application. The district court based this finding of knowledge on (1) the 1983 letter, written on The Ecumenical Order's official letterhead, sent to Plaintiff Order's headquarters abroad; (2) the letter from Stair Sainty to a member of The Ecumenical Order challenging its claimed connection to Plaintiff Order; and (3) the letter from de Merode to The Ecumenical Order expressing the view that the latter organization could dub knights.[10]

To prove the fraud claim based on misrepresentations in the declaration oath, The Florida Priory was required to establish that Pace "was aware other organizations were using the . . . mark (either in an identical form or a near resemblance) and 'knew or believed' those other organizations had a right to use

---

[10] Although it is questionable whether these facts even establish that Plaintiff Order *as an institution* knew of the existence of The Ecumenical Order, we need not address the validity of these factual findings because the fraud claim fails even accepting that Plaintiff Order knew of The Ecumenical Order.

17

the mark." *Angel Flight*, 522 F.3d at 1211 (analyzing a similar declaration). The declarant-focused text of the application oath requires the signatory's good-faith, subjective belief in the truth of its contents. *See, e.g.*, *Bose*, 580 F.3d at 1245 ("Subjective intent to deceive . . . is an indispensable element in the [fraud] analysis."); *Marshak v. Treadwell*, 240 F.3d 184, 196 (3d Cir. 2001) ("[A]pplicants attest[] only to their own subjective knowledge and belief."); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1227 (10th Cir. 2000) ("[W]e focus on the 'declarant's subjective, "honestly held, good faith" belief.'" (quoting *San Juan Prods., Inc. v. San Juan Pools, Inc.*, 849 F.2d 468, 472 (10th Cir. 1988))); *see also* 6 McCarthy on Trademarks § 31:76 ("The oath is phrased in terms of a subjective *belief* such that it is difficult, if not impossible, to prove objective falsity and fraud so long as the affiant or declarant has an honestly held, good faith belief."). This requirement is implicit in our holding in *Angel Flight*, where we upheld a district court's cancellation of a mark because the declarant purposefully failed to disclose the right of others to use the mark at issue "even though *he* was aware organizations throughout the country were using the [mark] and had a right to do so." 522 F.3d at 1210 (emphasis added). Unlike the situation in *Angel Flight*, Pace had no awareness that any other organization was using the marks for which Plaintiff Order sought federal protection. This fact alone compels reversal

18

of the fraud finding, as Pace could not have intended to deceive the PTO in attesting to an oath that he believed was entirely accurate.[11]

To support its finding of fraud, the district court analogized to the Supreme Court's recent decision in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. ___, 131 S. Ct. 2060 (2011). *Global-Tech* considered whether knowledge of infringement was required to sustain a claim that a party actively induced infringement of a patent under 35 U.S.C. § 271(b). *Id.* at 2063. The Supreme Court held that knowledge, rather than deliberate indifference, was required to sustain a claim under § 271 and that "willful blindness" was sufficient to satisfy that knowledge element. *Id.* at 2068. Utilizing this concept, the district court explained that "[t]o the extent that a willful blindness standard applies here, the Court concludes that [Plaintiff Order]'s failure to inform Pace of the existence of

---

[11] We find it curious that the district court canceled four of Plaintiff Order's marks even though it found that they were not likely to be confused with those of The Florida Priory. *See Sovereign Military Hospitaller*, 816 F. Supp. 2d at 1302–03. We have explained that fraud requires a showing that the applicant's representative knew that other organizations were using the mark "either in an identical form or a near resemblance." *Angel Flight*, 522 F.3d at 1211; *see also Coach House Rest. v. Coach & Six Rests.*, 934 F.2d 1551, 1559 (11th Cir. 1991) (noting that a petitioner seeking to cancel a mark must prove "that the registered mark resembles petitioner's mark"). This requirement is based on the explicit language of the oath, in which the declarant affirms that "to the best of his/her knowledge and belief no other [entity] has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive." Thus, even if Pace actually knew about other organizations using the mark—which he indisputably did not—the district court's own finding on the confusion issue is inconsistent with its disposition of the fraud claim.

[T]he Ecumenical Order is evidence of willful blindness on [Plaintiff Order]'s part." 816 F. Supp. 2d at 1300.

It was error to look to this case for the applicable standard to analyze a claim for fraud on the PTO. We have been admonished to exercise caution before importing standards from one area of intellectual-property law into another. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n.19, 104 S. Ct. 774, 787 (1984). The Florida Priory has not pointed to any authority to establish the sort of "historic kinship" that may justify translation of a patent-infringement standard into the mark-application context. *Id.* at 439, 104 S. Ct. at 787; *see also United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S. Ct. 48, 50 (1918) (noting "little or no analogy" between trademark rights and those of patent or copyright); *McLean v. Fleming*, 96 U.S. 245, 254 (1877) ("Property in the use of a trade-mark . . . bears very little analogy to that which exists in copyrights or in patents for new inventions or discoveries . . . ."). The Florida Priory does not make an argument to otherwise justify the district court's use of this standard. To the extent the district court relied on the inapplicable "willful blindness" standard to find the required intent to deceive the PTO, it erred.[12]

_____

[12] In this context, the district court also wrote that "[e]ven if [Plaintiff Order] disputes actual knowledge, no adequate explanation has been offered for [its] subjective ignorance" of The Ecumenical Order and The Florida Priory. *Sovereign Military Hospitaller*, 816 F. Supp. 2d at 1300. Analyzing the information that Plaintiff Order or Pace "should have known"

20

There is one additional aspect of the fraud analysis that the district court did not address. If the declarant subjectively believes the applicant has a superior right to use the mark, there is no fraud, even if the declarant was mistaken. *See Bose*, 580 F.3d at 1246 ("There is no fraud if a false misrepresentation is occasioned by an honest misunderstanding or inadvertence without a willful intent to deceive."). Here, The Florida Priory did not put forth any evidence to establish that Pace—or Plaintiff Order, for that matter—knew or believed that The Ecumenical Order or The Florida Priory had a superior right to the marks at issue. *See Angel Flight*, 522 F.3d at 1211; *Citbank*, 724 F.2d at 1545 (rejecting a defendant's fraud claim where the plaintiff was the "senior use[r] of th[e] term"); *see also Sovereign Order of Saint John v. Grady*, 119 F.3d 1236, 1241 (6th Cir. 1997) ("[A] valid trademark registration requires only that the registrant 'believe' himself to be the owner of the mark." (quoting 15 U.S.C. § 1051)). Even assuming knowledge of The Ecumenical Order as of 1983, Plaintiff Order's relevant service mark registrations provide that the marks were first used in commerce in 1926 and 1927.[13] The bare knowledge that The Ecumenical Order existed as of 1983 does not undermine

---

impermissibly lowers the standard for fraud on the PTO, which contemplates the honestly held, good-faith belief of the declarant. *See Bose*, 580 F.3d at 1244.

[13] Registration Nos. 2,783,933 and 2,783,934 listed a date of December 31, 1926. Registration Nos. 2,915,824 and 3,056,803 listed April 28, 1927.

Plaintiff Order's claim to be the senior user of those marks because, even knowing

of The Ecumenical Order's existence, Plaintiff Order could justifiably believe that

its marks were superior based on their first use dating back to the 1920s. *See Star*

*Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)

(explaining that even though circumstantial evidence may be used to prove intent,

the evidence "must still be clear and convincing, and inferences drawn from lesser

evidence cannot satisfy the deceptive intent requirement"). In any event, The

Florida Priory failed to proffer any evidence to show that Pace (or Plaintiff Order)

believed that The Ecumenical Order had a right to use the objected-to marks in

commerce. This is fatal to the claim of fraud. *See Angel Flight*, 522 F.3d at

1210.[14]

In sum, the district court clearly erred in finding that Plaintiff Order

fraudulently obtained its marks. The district court's evaluation of the fraud claim

was factually unsupported and legally incorrect, and we reverse the cancellation of

the four marks.

### B. *Lanham Act Infringement*

---

[14] It is also worth pointing out that, looking at the broader picture, no entity in this scenario has even been misled by the purported nondisclosure at issue. When Plaintiff Order applied for federal service mark protection, the examining attorney at the PTO found a mark registered by The Delaware Corporation—an entity associated with The Ecumenical Order—and required Plaintiff Order to distinguish itself from that prior registration, which Plaintiff Order successfully did. The PTO therefore knew about the prior uses that Pace and Plaintiff Order allegedly withheld from it, removing the possibility that the PTO was misled by the application.

Plaintiff Order next challenges the district court's finding that its registered design service mark was not confusingly similar to the identifying design used by The Florida Priory. The Lanham Act prohibits the unauthorized use of a mark in commerce that is confusingly similar to a registered service mark. 15 U.S.C. § 1114(1)(a). To prevail on a civil infringement claim brought under 15 U.S.C. § 1125, a plaintiff must establish that (1) its mark is entitled to protection and (2) the defendant "adopted an identical or similar mark such that consumers were likely to confuse the two." *Int'l Stamp Art, Inc. v. United States Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006) (per curiam). In determining whether two marks are likely to be confused, the district court must consider seven factors: (1) the type of mark, (2) the similarity of the marks at issue, (3) the similarity of the services the marks represent, (4) the similarity of the parties' service outlets and customers, (5) the nature and similarity of the parties' advertising media, (6) the defendant's intent, and (7) any actual confusion. *Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999); *Coach House Restaurant, Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1561 (11th Cir. 1991). "The extent to which two marks are confusingly similar cannot be assessed without considering all seven factors to ensure that the determination is made in light of the totality of the circumstances." *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833

23

F.2d 1484, 1488 (11th Cir. 1987). At the same time, we recognize that a district court need not "specifically mention each of the seven factors in order to avoid reversal on appeal." *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1542 (11th Cir. 1985); *see also Wesco Mfg.*, 833 F.2d at 1489 ("[W]e may affirm an ultimate finding on the issue of confusion that is not clearly erroneous, even when the district court fails to consider all seven factors."). Ultimately, our ability to consider the district court's likelihood-of-confusion determination depends on whether the lower court found sufficient facts to permit meaningful appellate review. *See Wesco Mfg.*, 833 F.2d at 1489. If it has not, then we may remand for the district court to conduct the proper analysis. *Id.*

In evaluating whether Plaintiff Order's service mark was likely to be confused with The Florida Priory's unregistered symbol, the district court described the visual appearance of the two graphics and then stated: "The Florida Priory's design contains two crosses, whereas [Plaintiff Order]'s registered mark contains only one. [Plaintiff Order]'s mark contains no crown. These marks are easily distinguishable, thus removing any possibility for consumer confusion." *Sovereign Military Hospitaller*, 816 F. Supp. 2d at 1301. Thus, it appears as though the district court's entire analysis of the likelihood of confusion was based on the visual dissimilarity of the marks—namely that The Florida Priory's symbol

24

contained a cross and crown that Plaintiff Order's mark did not.  The district court

did not make any additional factual findings related to the infringement claim or

address the applicability (or inapplicability) of any other factor germane to the

infringement analysis.

It is beyond any real dispute that the district court erred in focusing "solely

on the degree of visual similarity between the two marks."  *Wesco Mfg.*, 833 F.2d

at 1489.  The other factors bearing on the likelihood of confusion are "[e]qually as

significant as the general appearance of the trademarks."  *Sun-Fun Prods., Inc. v.*

*Suntan Research & Dev., Inc.*, 656 F.2d 186, 189 (5th Cir. Unit B Sept. 17, 1981)

(quotation omitted).  As such, when a district court "completely disregard[s] the

proper analysis" in making its determination of confusion, we may vacate its ruling

and remand for consideration of the claim using the proper framework.  *See Wesco*

*Mfg.*, 833 F.2d at 1489.  Here, because the district court did not make any

additional factual findings to aid us in evaluating whether it committed clear error,

we have an "insufficient basis" to evaluate its ultimate conclusion.  *Id.*  As a result,

we remand the infringement claim so the district court may conduct the proper,

multi-factor infringement analysis for the design marks.[15]  The district court should

also conduct this analysis for Plaintiff Order's word marks, which were improperly

---

[15] We express no opinion with regard to the ultimate outcome of this claim.

25

canceled for fraud.

## C. Lanham Act False Advertising

Under the Lanham Act, an entity that misrepresents the "nature, characteristics, qualities, or geographic origin" of its services in commercial advertising or promotion is liable to the persons damaged by the false or misleading representation. 15 U.S.C. § 1125(a)(1). We have interpreted this language to require a plaintiff to demonstrate that: (1) the defendant's statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumers' purchasing decision; (4) the misrepresented service affects interstate commerce; and (5) it has been, or likely will be, injured as a result of the false or misleading statement. *See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002).

Plaintiff Order's false advertising claim was based on its position that The Florida Priory does not share any history with, and has no connection to, the historic Order of Malta. It argues that The Florida Priory's adoption of Plaintiff Order's pre-1798 historical lineage and corresponding record of charitable activities is likely to deceive customers into contributing money to The Florida Priory. In assessing this claim, the district court was faced with the monumental

26

task of adjudicating the accuracy of two competing versions of late-eighteenth-to-early-nineteenth century history. The testimony of Plaintiff Order's witnesses advised that The Ecumenical Order—and therefore The Florida Priory—had no connection to Plaintiff Order and that no split ever occurred in the long history of Plaintiff Order as an organization. (D.E. 144, 39:5–7; D.E. 145, 124:7–10.) The testimony of The Florida Priory's witnesses, however, sought to establish that as a result of Napoleon's 1798 invasion of Malta, the original Order of Malta essentially ceased to exist. They advised that other religious orders connected to that parent group sprung up, two of which are Plaintiff Order and The Ecumenical Order. In their eyes, The Florida Priory connects to The Ecumenical Order, which connects to the original Knights of Malta, just as Plaintiff Order is connected to the original Knights of Malta.

The district court essentially agreed with the version of history as presented by The Florida Priory. On appeal, Plaintiff Order argues that its witnesses, rather than those of The Florida Priory, accurately recited the relevant history. It attributes error to the district court's reliance on the testimony of Papanicolaou—who did not hold himself out to be an expert in history—over the testimonies of Gamble and Dr. Vann—only one of whom was qualified as an expert in the history

of the Order of Malta. [16] We conclude that although the district court abused its discretion in considering Papanicolaou's testimony, that error was harmless. Therefore, we affirm the district court's disposition of the false advertising claim.

We acknowledge that the district court erred when it permitted Papanicolaou, a lay witness, to testify about historical matters. Papanicolaou had neither "personal knowledge" of the historical facts about which he spoke, Fed. R. Evid. 602, nor could he offer testimony in the form of an opinion based on his "perception" of those historical facts. Fed. R. Evid. 701. Papanicolaou should have been qualified as an expert witness. Nevertheless, "[w]here a District Court abuses its discretion in admitting evidence, we may still find the error harmless." *United States v. Gamory*, 635 F.3d 480, 492 (11th Cir. 2011) (citation omitted). An evidentiary error is harmless if "sufficient evidence uninfected by any error

---

[16] We note that the district court never actually ruled on Plaintiff Order's objection to Papanicolaou's testimony. The relevant colloquy is as follows:

> [Plaintiff Order]: And, Your Honor, we object. The witness
> has not been qualified to testify as an historian.

> THE COURT: Well, you'll be able to cross-examine him
> on this. I don't know if he's looked at original records and
> documents, but I'll let him testify.

(D.E. 146, 17:8–12.) The objection was not renewed so as to permit the district court an opportunity to definitively rule on the propriety of the testimony or whether it was even expert in nature.

supports the verdict, and the error did not have substantial influence on the outcome of the case." *United States v. Khanani*, 502 F.3d 1281, 1292 (11th Cir. 2007) (internal quotation marks and citation omitted).

The district court held that "[r]eferences by the Florida Priory to a shared history with [Plaintiff Order] are perfectly appropriate, as the organizations shared a history prior to 1798. Any claim for false advertising also rings hollow given that the Florida Priory expressly associates itself with the Ecumenical Order, a non-Catholic organization." 816 F. Supp. 2d at 1302. This language indicates two discrete factual determinations, each of which independently supports the district court's holding that The Florida Priory did not engage in false advertising via a misappropriation of Plaintiff Order's history: first, the two organizations shared a history up until 1798; and second, The Florida Priory is an expressly *non*-Catholic organization. We conclude that despite its abuse of discretion in allowing Papanicolaou to testify, the district court was not "substantially swayed" by Papanicolaou's inadmissible testimony because the holding's alternative ground— that The Florida Priory is non-Catholic—is sufficient to uphold the district court. *See Aetna Cas. & Sur. Co. v. Gosdin*, 803 F.2d 1153, 1160 (11th Cir. 1986).

As the district court observed in its opinion, "[t]o succeed on the merits of a false advertising claim, [Plaintiff Order] must plead and prove that the Florida

Priory's alleged deception is likely to influence the purchasing decision." 816 F. Supp. 2d at 1301 (internal quotation marks and citation omitted).

The district court found that Plaintiff Order's false advertising claim "rings hollow" given that The Florida Priory is an expressly non-Catholic organization, and on this basis alone we may affirm the district court's judgment. *See 1-800 Contacts*, 299 F.3d at 1250 (noting that a plaintiff must demonstrate "that the deception is likely to influence the purchasing decision"). The trial record abounds with references to The Florida Priory's interdenominational nature. *See, e.g.*, D.E. 145, 152:11–14 (Rick Joyner, a member of The Florida Priory, testifying that it is not a Catholic organization); (D.E. 25-11: 2) (January 10, 1908, minutes stating: "It is understood that our Order shall be open to qualified individuals of all recognized Christian denominations." (internal quotation marks omitted)). And of course, by its very name, the Ecumenical Order is an interdenominational organization. It is evident, therefore, that the district court's admission of Papanicolaou's testimony was harmless, given that his testimony had nothing to do with the district court's alternative ground for dismissing Plaintiff Order's false advertising claim.

At bottom, the district court erred when it allowed Papanicolaou to testify— that much is true. Nevertheless, we conclude that the district judge was not

30

substantially swayed by Papanicolaou's testimony, because the uninfected evidence—namely, The Florida Priory's unequivocally interdenominational nature—rendered moot any possibility that the alleged deceptions about Napoleonic history would influence purchasing decisions. *See 1-800 Contacts*, 299 F.3d at 1250.

### D. State Law Unfair Competition and FDUTPA

The success of Plaintiff Order's state unfair competition and FDUTPA claims is tied to the federal Lanham Act claims for infringement and false advertising. *See Natural Answers, Inc. v. Smithkline Beecham Corp.*, 529 F.3d 1325, 1333 (11th Cir. 2008). Because we vacate the ruling on the infringement claim as related to the design mark and remand for reconsideration utilizing the multifactor test, we likewise vacate the district court's conclusions with regard to the analogous state claims.

Next, because we reverse the district court's cancellation of the registered word marks, we also vacate the portion of the district court's order disposing of the state claims based on these word marks so it has the opportunity to revisit them based on a complete analysis under the correct standard. In conducting this analysis, we caution the district court to limit its analysis to facts in the record and to refrain from consulting outside sources on the Internet that have not been cited,

31

submitted, or recognized by the parties. Remand is proper here because it is unclear to what extent the district court relied on its own, extra-record Internet research into similarly named organizations, *see Sovereign Military Hospitaller*, 816 F. Supp. 2d at 1303 & n.14, to conclude that The Florida Priory's unregistered marks are not likely to be confused with Plaintiff Order's word marks. *See Johnson v. United States*, 780 F.2d 902, 910 (11th Cir. 1986) ("The trial judge may not . . . undertake an independent mission of finding facts 'outside the record of a bench trial over which he [presides].'" (quoting *Price Bros. Co. v. Phila. Gear Corp.*, 629 F.2d 444, 447 (6th Cir. 1980)) (second alteration in original)). The websites that the district court identified were proffered by neither party, and Plaintiff Order had no opportunity to contest the validity of the information contained therein, rendering it an improper consideration in the confusion analysis.[17]

### E. Reassignment on Remand

In its briefing and at oral argument, Plaintiff Order brought to our attention instances from the bench trial and the district court's published findings of fact that disparage the parties, witnesses, or their work. In its findings of fact, the district court wrote that, although it understood that the parties presented themselves as

---

[17] Again, we express no opinion on the ultimate outcome of these state law claims.

32

Christian charities, it "struggle[d] with the parties' characterizing themselves in that manner." *Sovereign Military Hospitaller*, 816 F. Supp. 2d at 1294 n.2. The district court attributed this confusion to the "unimpressive" amount of money each group raised for charitable purposes, which led the court to believe that the members of both organizations "are more interested in dressing up in costumes, conferring titles on each other and playing in a 'weird world of princes and knights' than in performing charitable acts." *Id.* (quoting the judge's comments in the trial transcript, D.E. 144, 131:19–20). During the trial, the judge opined that it was "tragic" that all Dr. Vann had done in her life was study the Knights of Malta and their records. (D.E. 145, 8:1–6.) He also expressed his disbelief that two charitable organizations would spend their time and money on litigation. (D.E. 144, 34:5–7.)

These remarks are wholly inappropriate in the context of a judicial proceeding and a published judicial opinion. Although a judge is not required to check his or her sense of humor at the courthouse door, we must be mindful that the parties rely on the judge to give serious consideration to their claims. Litigants are understandably frustrated when they are subject to the sort of unnecessary belittling commentary about which the parties complain here.

Plaintiff Order seeks to invoke our supervisory authority to reassign this case

to a different district judge on remand.  *See United States v. Torkington*, 874 F.2d 1441, 1446 (11th Cir. 1989) (per curiam).  We have explained that reassignment is proper when a "trial judge has engaged in conduct that gives rise to the appearance of impropriety or a lack of impartiality in the mind of a reasonable member of the public."  *Id.*  In the absence of bias, we consider three factors in determining whether reassignment is justified: "(1) whether the original judge would have difficulty putting his previous views and findings aside; (2) whether assignment is appropriate to preserve the appearance of justice; [and] (3) whether reassignment would entail waste and duplication out of proportion to gains realized from reassignment."  *Id.* at 1447.  We think the district court's remarks, though offensive to both parties, do not rise to the level of conduct that warrants assignment to a different judge on remand.  We are hard-pressed to surmise actual bias in favor of, or against, one party over the other.  Moreover, we are confident that, on remand, both parties will be treated with the respect they deserve and that the district court will be able to freshly consider the remanded claims notwithstanding its previously expressed views.  And, given the fact-intensive nature of this case, any reassignment would necessarily require duplication of resources expended by the parties and the court.  Accordingly, we deny Plaintiff Order's request for reassignment on remand.

34

## IV. Conclusion

We conclude that the district court clearly erred in evaluating the claim that Plaintiff Order committed fraud on the PTO and reverse the cancelation of the four word marks, Registration Nos. 2,783,933; 2,783,934; 2,915,824; and 3,056,803. Because we were not presented with sufficient findings to review the Lanham Act infringement claims, we vacate the district court's ruling on that issue and remand for it to consider, under the correct legal standard, confusion with respect to all of Plaintiff Order's marks—including the four word marks. In light of that disposition, we vacate the district court's ruling on the state law claims. Finally, we affirm the district court's finding on the Lanham Act false advertising claim in favor of The Florida Priory.

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.**