Anna D. KENNEDY and Donald E. Kennedy, Legal Successors of Edwin K. Kennedy, Deceased, Plaintiffs-Appellees,

v.

The GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., et al., Defendants-Appellants.

No. 75–3040.

United States Court of Appeals, Fifth Circuit.

April 27, 1977.

Rehearing and Rehearing En Banc Denied May 24, 1977.

Gordon E. Rountree, Shreveport, La., for defendants-appellants.

H. F. Sockrider, Jr., Fred H. Sutherland, Shreveport, La., for plaintiffs-appellees.

Before TUTTLE, GOLDBERG and CLARK, Circuit Judges.

TUTTLE, Circuit Judge:

The defendants appeal from a jury verdict and judgment in favor of the plaintiffs,

legal successors of Edwin K. Kennedy, deceased, who was injured when he fell in a store belonging to The Great Atlantic and Pacific Tea Company. Although the case for the plaintiffs in the trial court was not a strong one, we conclude that the trial court properly overruled a motion for directed verdict and submitted the case to the jury. We also conclude that the questions raised by the appellants with respect to the Court's charges and refusals to charge must be resolved in favor of the appellees.

The one significant point raised by the appellants arose from circumstances which appear to be quite unique. In order to understand these circumstances, it is necessary to give a short history of Mr. Kennedy's fall and the subsequent events leading up to trial which is here appealed from. On a rainy and wet morning of March 10, 1973 at approximately 11:30 a. m., Edwin K. Kennedy, 82 years of age, entered the rear entrance of the A&P Store. After he had proceeded a few feet inside the rear entrance door, he slipped and fell and broke his hip. This resulted in an action brought against the defendant Atlantic and Pacific Tea Company and its insurer, Aetna Casualty and Surety Company. The trial of the case was commenced on April 14, 1975. After three days of trial, Mr. Kennedy passed away from other causes. A mistrial was ordered. Mr. Kennedy's survivors were substituted as party plaintiffs and the case was subsequently tried by a jury, beginning on July 14, 1975. The jury awarded judgment in favor of the plaintiffs for $35,000.

The type of evidence, much the same as in any slip-and-fall case, included opinion evidence by plaintiffs, opposed by opinion evidence by defendants, that the existence of heavy rain outdoors could or could not have contributed to the wetness at about the place where Mr. Kennedy fell. By the time the first trial had been terminated, these issues had been sharply drawn.

At a time, some five weeks before the second trial, James Madison, who was currently serving the trial judge as his law clerk, and who had heard the trial proceedings until the mistrial, decided he would satisfy his curiosity by taking a look at the premises. He passed the store on June 6, during a heavy rain. The following day, while on the way to dinner with his date, a Miss Friend, he drove around to the back of the store where the entrance was, through which Mr. Kennedy had entered the premises, found the door locked but found a crack wide enough to permit him to look inside. Miss Friend also looked inside. They later testified that they both saw a puddle of water on the floor near the place where Mr. Kennedy had fallen.

Because, by supplemental brief the appellees dispute appellants' contention as to the part the trial judge played in the matter, it is necessary to point out that the statement in the supplemental brief that "there is absolutely nothing in the record, nor are we aware of any facts, to indicate that Judge Dawkins directed Mr. Madison to contact Mr. Rountree or that he asked Mr. Madison not to disclose any information to plaintiffs' counsel" is completely incorrect. The record references to the trial judge's handling of the matter deal with a conference held in chambers on the morning the trial commenced. At this time, addressing the judge, defense counsel said:

"MR. ROUNTREE: Your Honor, If I may have an objection to the record, I have several grounds for the objection. First of all, I would like to state my objection certainly should not be taken by Mr. Madison as anything personal at all. I don't intend anything personal insofar as the Court is concerned.

THE COURT: We understand that.

MR. ROUNTREE: The facts as I appreciate them from my standpoint occurred this way: I received a phone call in my office apparently several days after Mr. Jimmy Madison went out to the A & P and he advised he did go to the A & P and found an accumulation of water on the floor inside the rear entrance. At that time, I felt the visit was inappropriate in view of his position as your law clerk and at that time I asked Mr. Madison to not relate it to Your Honor and he told me at that time he already told you

about it and the purpose of his call was, were we any closer to settlement and that this situation might have some bearing on settlement.

He also stated it would not go any further than that, including plaintiffs' attorneys. I felt it was inappropriate to advise me and I was advised. He advised me it was not going to be related to anyone else. Then on the morning of the trial, Your Honor related Mr. Madison's visit to all counsel."

Thereupon, the court, without in any way questioning counsel's statement of the facts, made the following comment:

"Of course, after having learned of Mr. Madison's curiosity visit to the A & P it was hoped that there was some change in management both at the A & P and the claim department of Aetna and that this might assist in affecting (sic) a settlement. When we reached the trial and no settlement was affected, then I thought it was required of me that I relate what Mr. Madison told me to plaintiff's counsel. Perhaps I was wrong in my judgment but it has not affected by presiding at the trial."

The court also interjected the following:

"The record will show I tried to be as fair as possible in my rulings to both sides and I intend to do that.

I have not been prejudiced by that. . . . and it was only in the interest of promoting a settlement to tell Mr. Madison to advise plaintiffs' counsel of what he told me. I thought he owed plaintiffs' counsel a duty to know about it."

Obviously, the words "plaintiffs' counsel" where used twice in this quotation were intended to be "defendants' counsel," because it is clear that the trial judge did not ever tell Mr. Madison to advise plaintiffs' counsel of anything. He personally advised plaintiffs' counsel of the Madison experience on the first day of the trial two days earlier.

Moreover, in arguing before the court at the same hearing in camera, counsel for the plaintiffs repeated the facts in even more detailed manner than had been stated by his opponent. He said:

"I think it would be improper and I do not intend to elicit *the fact that Mr. Madison reported this to Judge Dawkins and Judge Dawkins recommended, because of his personal knowledge of settlement negotiations, it be revealed to Mr. Rountree [defense counsel].* I do not intend to elicit the *fact that it was not revealed to us and the fact that we learned of it the first morning of trial.*" (Emphasis supplied.)

If anything is clear, it is that plaintiffs' counsel fully accepted the fact situation which we state concisely to be as follows. A few days after the "view," Madison called on defense counsel and told him what he and Miss Friend had seen. Counsel protested and informed Madison that in his opinion, Madison should not have brought the matter to his attention and that he should not disclose the matter to the trial judge. Thereupon, Madison reported that it was on the trial judge's instruction that he had brought the matter to the attention of defense counsel with the thought that it might assist in effecting a settlement of the case. Madison also stated that the trial judge had instructed him not to inform the plaintiffs' counsel of the matter.

Apparently no acceptable offer to settle the case was forthcoming by the new management of A&P or by the claim department of the insurance carrier based upon the ex parte communication from the trial judge to the defense counsel, for the case was called for trial approximately a month later, on July 14, 1975. Plaintiffs' counsel hadn't been notified until the day of trial. Following a discussion in the judge's chambers, they stated that the two witnesses would be called to testify on behalf of the plaintiffs. Just prior to the calling of Mr. Madison to the witness stand, two days later, defense counsel made various objections to his and Miss Friend's testifying under the circumstances here outlined.

We consider here only the objections arising from the peculiar and unusual circum-

stances surrounding the proposed evidence, circumstances which appellants characterize as "the presiding judge's law clerk [being] out gathering evidence for one side or the other." Counsel adequately challenges the propriety of permitting the Madison and Friend testimony by pointing to the serious threat to the ability of the jury to receive with proper degree of impartiality the testimony of the actions of the trial judge's law clerk who, having heard much of the case presented on a first trial, went out and had a private view of the premises before the second trial and was now presented as a witness to facts which greatly favored plaintiff.

The trial court undoubtedly undertook to handle the situation in a manner which he sincerely believed to be appropriate, but we are compelled to conclude that under the supervisory power of this Court we must find that prejudicial error occurred which requires that the judgment be vacated.

■ In response to defendant's motion that the two witnesses not be permitted to testify, the trial court made comments as to the trustworthiness of Mr. Madison to counsel in his chambers which might well have been calculated to curb the normal zeal of opposing counsel to conduct searching cross-examination.[1] Moreover, the very fact that the witness was the judge's law clerk who had heard the evidence pro and con at the first trial would, it seems to us, make the cross-examination a very delicate matter for defense counsel. Any challenge of Mr. Madison's credibility or reliability as a reporter of facts would probably be totally unavailable, but more particularly, under our adversary system of justice, it was unacceptable that the most damaging evidence against the defendants in this case was brought about by the intervention of a court official in the accumulation of evidence. The law clerk learned of the litigation and of the disputed issues by virtue of his employment as law clerk to the trial judge. It was his duty as much as that of the trial judge to avoid any contacts outside the record that might affect the outcome of the litigation. This we perceive to be the basis, so far as related to the judge himself, of the existing Canon 3(A)(4) of the Code of Judicial Conduct for United States Judges which provides: "A judge should . . . neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. . . . "

This provision of the Code was adopted verbatim from the Code of Judicial Conduct of the American Bar Association, adopted on August 16, 1972. In the Reporter's Notes upon the adoption of the American Bar Code, the following explanatory language may be found:

"Canon 3(A)(4) and commentary are based in part on old Canon 17. Old Canon 16, titled 'Ex Parte Applications', was rejected because it is concerned with a matter of procedure that does not require a specific standard of ethical conduct. The drafting of the appropriate standard regulating ex parte communications proved to be difficult. In an adversary proceeding, ex parte communications by the judge to a party or his lawyer or by a party or his lawyer to the judge clearly should be precluded. . . . The committee concluded that unless the ex parte communication is authorized by law—statute, common law, and rule being the principal methods of authorization—the communication should be prohibited. . . . "

1. This comment is as follows:

"THE COURT: In that connection, Mr. Rountree, I expect to instruct the jury before Mr. Madison takes the witness stand that it was not at the instance of the Judge that Mr. Madison went to the store following the rainstorm. It was done purely on his own and not of any desire to favor one side or the other in this case, so I understand from him. That again, can be developed.

I also will instruct the jury that although Mr. Madison does bear the title of law clerk to me, and, of course, does owe to me certain loyalty as would be the case of my law clerk for a judge.

Having known Mr. Madison before he was born, in that his father and mother are both close friends of my wife and me, I find him to be a man of total integrity and I do not feel what he did was out of any desire or interest to prejudice one side of the other."

Reporter's Notes to Code of Judicial Conduct, E. Wayne Thode, p. 53.

By clearest analogy, a private view of the site of an accident in litigation resulting in testimony thereabout would seem to be *ex parte* communication.

Compliance with this requirement of the Code would have obviated all of the difficulty which we now face in the handling of this case. If the trial judge had not directed his law clerk to communicate the observed facts to defense counsel with the hope that this might aid in settling the case, and with instructions not to permit the facts to be communicated to the plaintiffs' counsel, the court would not have considered it necessary at the time of trial to have communicated the information to plaintiffs' counsel in order for him to call on Madison and Miss Friend as witnesses at the trial. We do not conclude that this deviation from the course prescribed in the Canon would of itself work a reversal of the case, but merely point out that compliance with the Canon would have prevented the chain of events that ultimately infected the jury verdict. As stated by the trial judge, when a settlement was not effected, he felt it incumbent on him to tell the plaintiff of the disclosure which he had directed his clerk to make to the other party. Under the circumstances, it is understandable that the plaintiff would wish to use the judge's law clerk as his witness. However, in electing to do so, he chose this course after being fully apprised by the defendant of the vulnerability of the proceedings if he should prevail before the jury.

Appellants also cite as support for their argument Rule 605 of the new Federal Rules of Evidence. This Rule states:

"*Competency of Judge as Witness*: the judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point."

Although dealing, as it does, with the matter of the judge himself being disqualified, rather than his law clerk, appellants point to some of the language of the Advisory Committee's Notes to Rule 605 which they say is equally applicable to the giving of testimony by a law clerk of the presiding judge during a trial before a jury. This Note contains the following discussion of the Rule:

"The solution here presented is a broad rule of incompetency, rather than such alternatives as incompetency only as to material matters, leaving the matter to the discretion of the judge, or recognizing no incompetency. The choice is the result of inability to evolve satisfactory answers to questions which arise when the judge abandons the bench for the witness stand. Who rules on objections? Who compels him to answer? Can he rule impartially on the weight and admissibility of his own testimony? *Can he be impeached or cross-examined effectively? Can he, in a jury trial, avoid conferring his seal of approval on one side in the eyes of the jury? Can he, in a bench trial, avoid an involvement destructive of impartiality?* The rule of general incompetency has substantial support. (Citations omitted). . . . " (Emphasis supplied).

Mr. Madison and Miss Friend were called to the witness stand on the third day of the trial. After Madison was sworn, the court made the following comment to the jury:

"Members of the jury, Mr. Madison is serving and has served since last August as law clerk to this judge. The court instructs you that you should not give any greater or any lesser weight to his testimony than you would that of any other witness simply because he occupies that position. As we told you in qualifying you to sit as jurors in this case, that you, and you alone, are the judges of the facts. You are the only ones who will make the final determination of the facts and by applying the laws will be given to you by the court in its final instructions reach a fair and impartial verdict."

Subsequently at the conclusion of Madison's testimony, the court addressed him and said: "Mr. Madison, just to make it perfectly clear, did I request you to go by the store in any way, shape or form?" The witness answered "No, Sir." Thereupon, the court

said: "Did I know anything about it until you reported it to me later?" The witness answered, "No, Sir."

In his testimony, Madison testified that by looking in a crack in the door he saw a puddle of water, which at one place he called a pond and then finally in response to a question by plaintiffs' counsel as to "what did you call it in your mind," he said "I would call it a small lake. That is an exaggeration, of course."

Subsequently just after Miss Friend was called as a witness and was sworn, the court interjected and stated the following: "I want to tell you that whatever Mr. Madison testified to is not necessarily the opinion of the Court. Even if you think the Court has an opinion on the facts that is not binding on you at all."

It is impossible to believe that the jury must not have attached some special significance to this testimony of the judge's law clerk who stated that he had been in court during the first trial of the case, as a result of which his curiosity caused him to have a private view of the site of the injury. Whereas normally, little weight might be attached to the condition of the inside of a vacant building some twenty-seven months after an accident had occurred when it was occupied by a self-service grocery store, the jury must have thought that for the judge's law clerk to take the trouble to go out and see the property to satisfy himself about this one fact it must have some special importance. Ordinarily, one who learns about an injury resulting from an accident doesn't take the trouble to go and look it up. What was the jury to think about this young man's injecting himself into the controversy after having heard the case being tried in the court in which he was playing a significant part?

In addition, there was the imprimatur of character, credibility and reliability that was automatically implied as coming from the court itself when the trial judge introduced the witness as his present law clerk.

■ As noted in a recent decision of this Court in *United States of America v. Chiantese and Cerella,* 5th Cir., 546 F.2d 135,

Jan. 28, 1977, rehearing en banc granted March 28, 1977, the Supreme Court has said that it is imperative "that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated." *Ma⁺tox v. United States,* (1892), 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917. In subsequent cases, new trials were granted where it was shown that a bailiff made prejudicial remarks to juror. *Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966).

■ This Court has addressed the issue of possible improper handling of matters that might adversely affect the jury's impartial consideration of the case. In *Johnson v. United States,* (5th Cir. 1953), 207 F.2d 314, we recognized the rule that "communications between jurors and third persons, or witnesses, relative to the case on trial are absolutely forbidden and presumed to be prejudicial." 207 F.2d at 322. In the *Chiantese & Cerella* case, one of the jurors was heard to make a derogatory remark to another juror about defendant's counsel during the trial. We held that:

> ["At a] minimum the lower court should have conducted an inquiry into the alleged misconduct to determine what prejudice, if any, resulted therefrom and thereafter to take appropriate action. The Court erred in its failure to do so."

Here, in light of the unusual situation that the potential for damage resulted from the identification of the witness with the trial judge, we are unable to see how any worthwhile inquiry as to possible prejudice would have been fruitful. While these cited cases do not deal with the same factual situation that exists here, they are instructive as to the standards required to assure a jury's being free of "external causes tending to disturb the exercise of deliberate and unbiased judgment." *Mattox v. United States, supra.* In any event, it seems clear that the potential for prejudice to the defendants' case was too great for us now to conclude

that the trial court's overruling of the defendants' motion to prohibit the testimony of Mr. Madison and Miss Friend or, in the alternative, to disqualify himself from continuing in the trial was harmless error.

The judgment is REVERSED and the case is REMANDED for further proceedings not inconsistent with this opinion.