# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 9, 2021

Lyle W. Cayce
Clerk

No. 20-40624

United States of America,

*Plaintiff—Appellee*,

*versus*

Judith L. Brocato; Dick Brocato, Jr.,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Eastern Division of Texas
USDC No. 1:19-CR-133

Before King, Dennis, and Ho, *Circuit Judges*.

Per Curiam:

Judith and Dick Brocato were convicted by a jury of conspiracy to commit tax fraud, in violation of 18 U.S.C. § 371, and filing false returns, in violation of 26 U.S.C. § 7206(1), and were sentenced to 33 months imprisonment on all counts, to run concurrently. Prior to sentencing, they moved to recuse the district judge who presided over their trial. The motion was denied, and the Brocatos were sentenced. On appeal, they seek recusal of the district judge, vacatur of their sentences, and resentencing by a different judge. Although we think that certain statements of the district court judge were ill-advised and certain actions of her staff were improper,

No. 20-40624

we nonetheless AFFIRM because, after a thorough review of the record, we conclude that there was no actual bias or reasonable question as to the judge's impartiality in this case that would require recusal.

## I.

The Brocatos, a married couple, owned a lawn care company, Superior Lawn Service. Judith was the president and bookkeeper of Superior. Over a three-year period, the Brocatos concealed approximately $1.7 million of business income. They were charged with conspiracy to commit tax fraud and multiple counts of filing false tax returns. After a three-day trial, the jury convicted on all counts.

On the second day of trial, Internal Revenue Service (IRS) special agent Regina Kelley testified for the Government. Kelley testified, among other matters, that Judith purchased a Maserati sedan in 2013 and paid part of the down payment with $9,000 in cash. Judith also testified on the second day of trial. She admitted to routinely shredding business documents, including immediately after receiving a records request from the IRS. On direct examination, Judith was also asked about the source of the $9,000 in cash that she used to cover part of the Maserati down payment:

Q. Where did that $9,000 come from?

A. My mother. She passed away.

Q. Okay. And you got that $9,000 from her estate?

A. Yes, sir.

Q. And that's what you used?

A. Yes, sir.

The Government did not attempt to impeach or otherwise contest Judith's testimony about the source of the $9,000.

No. 20-40624

The next day, February 5, 2020, before closing arguments, Judith's testimony was discussed in an unrecorded, in-chambers conference. The district court later recounted that "the court convened a meeting with counsel in chambers to discuss the jury charge, consistent with the court's practice, and merely instructed counsel for the Brocatos not to represent during closing argument that the source of the $9,000.00 cash was the estate of Mrs. Brocato's deceased mother." According to the Brocatos, the judge advised that "her staff had conducted an Internet search and found an obituary" that suggested "Mrs. Brocato could not have obtained the $9,000 from her mother's estate," leading the judge to conclude "that Mrs. Brocato had committed perjury during her testimony."

That same day, after the Brocatos were convicted, the district court outlined the sentencing process to them and addressed the issue of their release pending sentencing. The Government stated it had no objections to the Brocatos "remaining out on bond" and defense counsel proposed "continu[ing] on the same conditions of release," but the court said that it "d[id]n't feel comfortable" with that and would require each defendant to post a $100,000 bond. It gave the following explanation:

> The Court is very troubled about testimony about shredding documents, discarding evidence, and the perjury that occurred in this courtroom about the source of the $9,000 cash where Mrs. Brocato said that it was from her mother's estate. But the transaction with the Maserati occurred in 2013 and it appears from the obituary of her mother that she died in 2015; so, I don't think she would have gotten money in 2013 from her mother's estate. The Court takes a very dim view of perjury in proceedings; so, you need to keep that in mind.

The presentence report (PSR) for each defendant identified a guidelines range of 33 to 41 months in prison based on a criminal history category of I and a total offense level of 20. Although Judith's PSR referred

to her testimony about the $9,000 as potential grounds for an obstruction-of-justice enhancement, it deemed the enhancement unwarranted because "the misinformation does not appear purposeful." The probation officer noted that Judith had explained that she received money from her mother before the latter died and that "she was nervous while testifying and any statement suggesting she received the [$9,000] from her mother after her mother's death was simply a mistake." The final PSRs were filed on August 10.

On August 14, the court requested a certified copy of Judith's mother's death certificate from defense counsel. A week later, the Brocatos filed a motion to recuse the district judge. Invoking 28 U.S.C. §§ 144 and 455(a) as well as the Fifth Amendment's Due Process Clause, they argued that the district court's "*sua sponte*, *ex parte* investigation into Mrs. Brocato's credibility," its accusation of perjury, and its decision to increase both defendants' bond obligations evinced actual or apparent bias warranting recusal. The motion included a certificate of good faith signed by counsel and sworn affirmations by Dick and Judith that "everything contained herein is true and correct." Four exhibits were attached, including the court's request for a certified death certificate; a letter from Judith disclaiming any intent to testify falsely and stating that her mother made gifts of money in the years before she died; and affidavits from Judith's daughter-in-law Amy Brocato and from Lauren Moore, a longtime hairdresser for Judith and her mother, offering support for Judith's statement. In addition, Moore averred that she was present when the district court spoke of Judith committing perjury and that the judge was clearly "angry and upset."

The district court denied the recusal motion on September 2. It acknowledged that "[c]ourt staff discovered that Mrs. Brocato's mother, Verna Jo Carter ('Mrs. Carter'), died in 2015, at least two years after the [Maserati sedan] was purchased." However, the court wrote, "staff was not instructed to investigate any of the parties and did not bring this information

to the judge's attention until after Mrs. Brocato finished testifying and the Government had not cross-examined her on the issue." The district court first determined that the Brocatos' reliance on § 144 was unavailing because the affidavits from Lauren Moore and Amy Brocato failed to show bias. It then concluded that § 455 and the Due Process Clause did not require recusal either.

At sentencing hearings on September 9, the district court adopted both PSRs in full, denied defense requests for an adjustment for acceptance of responsibility or for a downward variance, and sentenced both Judith and Dick at the low-end of the guidelines range to 33-months imprisonment to be followed by one year of supervised release. The district court also imposed $617,762 in restitution. This appeal followed.

## II.

On appeal, the Brocatos do not challenge their convictions or sentences. Rather, they argue that the district court abused its discretion in denying their motion to recuse, and they seek resentencing by a different district judge. In response, the Government asserts that the judge was not required to recuse herself, and that even if it were an abuse of discretion under statutory law not to recuse, any such error was harmless.

We review the denial of recusal motions under 28 U.S.C. § 144 and § 455 for abuse of discretion, with errors subject to harmless-error review. *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 483–85 (5th Cir. 2003). When assessing harmlessness in this particular context, we consider three factors: "(1) the risk of injustice to the parties in the particular case; (2) the risk that denial of relief will produce injustice in other cases; and (3) the risk of undermining the public's confidence in the judicial process." *United States v. Monroe*, 178 F.3d 304, 309 (5th Cir. 1999); *see also Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 864 (1988). However, we review alleged due

process violations *de novo*. *See, e.g., United States v. Burns*, 526 F.3d 852, 859 (5th Cir. 2008). If a failure to recuse constitutes a due process violation, such error is not subject to harmless-error review. *See Williams v. Pennsylvania*, 136 S. Ct. 1899, 1909 (2016).

## III.

Two federal statutes govern recusal of district court judges for bias: 28 U.S.C. §§ 144 and 455. *See United States v. Scroggins*, 485 F.3d 824, 829 & n.19 (5th Cir. 2007).

Section 144 requires recusal when a judge "has a personal bias or prejudice" against or in favor of a party. The statute includes a procedure by which a party asserting that a judge is biased shall "make[ ] and file[ ] a timely and sufficient affidavit" that "shall state the facts and the reasons for the belief that bias or prejudice exists[.]" 28 U.S.C. § 144. "A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith." *Id*. The terms of § 144 at first glance appear to make recusal automatic upon filing of an affidavit. *Id*. ("Whenever a party . . . makes and files a timely and sufficient affidavit . . . such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."). However, the statute says that an affidavit must be "sufficient." In reviewing a recusal motion, our caselaw holds that the district judge "must pass on the sufficiency of the affidavit, but may not pass on the truth of the affidavit's allegations." *Patterson*, 335 F.3d at 483. "A legally sufficient affidavit must: (1) state material facts with particularity; (2) state facts that, if true, would convince a reasonable person that a bias exists; and (3) state facts that show the bias is personal, as opposed to judicial, in nature." *Id*.

Section 455(a) sweeps broader than § 144: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any

proceeding in which his impartiality might reasonably be questioned." Under § 455(a), "what matters is not the reality of bias or prejudice but its appearance," *Liteky v. United States*, 510 U.S. 540, 548 (1994), because "justice must satisfy the appearance of justice," *In re Murchison*, 349 U.S. 133, 136 (1955). In applying the statute, a court considers "whether a reasonable and objective person, knowing all of the facts, would harbor doubts concerning the judge's impartiality." *United States v. Jordan*, 49 F.3d 152, 155 (5th Cir. 1995) (citing *Liljeberg*, 486 U.S. at 860–61). The objective standard relies on the "well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person." *Andrade v. Chojnacki*, 338 F.3d 448, 455 (5th Cir. 2003) (quoting *Jordan*, 49 F.3d at 156). Justice Kennedy, concurring in *Liteky*, wrote that "§ 455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings," such that recusal was required "if it appears that [the judge] harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute." *Liteky*, 510 U.S. at 557–58 (Kennedy, J., concurring).

Of course, not all favorable or unfavorable opinions can be described as bias or partiality within the meaning of §§ 144 and 455(a). Rather, the concept of bias "connote[s] a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess . . . or because it is excessive in degree." *Liteky*, 510 U.S. at 550; *see also id.* at 552 (same regarding the concept of "partiality"). Accordingly, a judge is not generally required to recuse for bias, even if the judge is "exceedingly ill disposed towards the defendant," when the judge's "knowledge and the opinion it produced were properly and necessarily acquired in the course of

the proceedings[.]"  *Id.* at 550–51.  Thus, under either statute, adverse rulings or comments by a judge "will support a claim of bias only if they reveal an opinion based on an extrajudicial source or if they demonstrate such a high degree of antagonism as to make fair judgment impossible."  *Scroggins*, 485 F.3d at 830 (citing *Liteky*, 510 U.S. at 555).  The existence of an "extrajudicial source" is "a significant (and often determinative) . . . factor" in deciding recusal matters.  *Liteky*, 510 U.S. at 555.  At the same time, "the presence of extrajudicial facts, without something more, does not suffice to show bias."  *Tejero v. Portfolio Recovery Assocs, L.L.C.*, 955 F.3d 453, 463 (5th Cir. 2020).

## A.

First, addressing the distinction between an opinion that derives from an extrajudicial source and an opinion that arises in the context of judicial proceedings, *see Liteky,* 510 U.S. at 554–55, the Brocatos argue that the judge's opinion that Judith committed perjury derived from an extrajudicial source: the online obituary of Mrs. Carter discovered by the judge's staff as a result of an Internet search.  In denying the Brocatos' recusal motion, the district court disagreed, writing that the court's notion that Judith committed perjury derived from her testimony itself, and further, that Mrs. Carter's death certificate was a public record properly subject to judicial notice (and, therefore, non-extrajudicial).  On appeal, the Government argues likewise that Judith's testimony put the date of her mother's death at issue and led to the judge's opinion that Judith had committed perjury.  The Government further argues that the district court learned of and verified the date of Judith's mother's death in a "judicial capacity" and that it was proper for the court to consider the information at sentencing because the probation office had identified and discussed the possibility that Judith's testimony had obstructed justice in her PSR.

The situation presented by this case is not squarely covered by our cases, and, in any event, each recusal case "is extremely fact intensive and fact bound, and must be judged on its unique facts and circumstances more than by comparison to situations considered in prior jurisprudence" *Jordan*, 49 F.3d at 157. The Government cites *Tejero* for the proposition that information obtained outside of the courtroom can still be considered non-extrajudicial if a judge learned of the information in his or her "judicial capacity." 955 F.3d at 463–64. In *Tejero*, the knowledge at issue was a list of cases in which certain attorneys had acted as plaintiff's counsel. *Id.* Even though the judge "looked beyond the record" of the instant case in compiling the list, our court held that the knowledge was not "extrajudicial" because the list of cases "was simply a record generated by the ECF system" for the district court, and the judge's "method of compiling the list of cases was evenhanded and well within the normal day-to-day activities of a judge presiding over a similar case" and therefore not "problematic." *Id.*

The Brocatos rely on *Kennedy v. Great Atlantic & Pacific Tea Co., Inc.*, 551 F.2d 593 (5th Cir. 1977). In *Kennedy*, the law clerk for the district judge presiding over a slip-and-fall case decided to visit the scene of the accident. *Id.* at 594. The law clerk then recounted his observations to the judge and eventually the visit was disclosed to counsel, which resulted in the clerk being called as a witness at the subsequent trial. *Id.* at 594–95. On appeal, this court reversed the denial of defense counsel's motion to recuse the trial judge and prevent the law clerk from testifying. *Id.* at 598–99. The court in *Kennedy* characterized "the intervention of a court official in the accumulation of evidence" as "unacceptable" in "our adversary system of justice." *Id.* at 596. We also likened the law clerk's investigation to a prohibited *ex parte* communication and stated that "[i]t was [the law clerk's] duty as much as that of the trial judge to avoid any contacts outside the record that might affect the outcome of the litigation." *Id.*; *see also Hall v. Small Bus. Admin.*,

695 F.2d 175, 179 (5th Cir. 1983) (describing "law clerks" as "sounding boards for tentative opinions" who are "privy to the judge's thoughts in a way that neither parties to the lawsuit nor his most intimate family members may be" such that "the clerk is forbidden to do all that is prohibited to the judge").

We think the circumstances in this case are clearly distinguishable from *Tejero*. The online search that revealed Mrs. Carter's obituary, presumably undertaken to discover additional facts relating to the case, is not "within the normal day-to-day activities of a judge" or her staff. *Tejero*, 955 F.3d at 464. While we acknowledge that the online search in this case was not as disruptive to the proceedings as the law clerk's activities in *Kennedy*—in *Kennedy,* our court had to reverse the judgment entered upon the jury verdict and remand for new proceedings, *see* 551 F.2d at 598–99, while the Brocatos do not challenge their convictions, but only seek resentencing—in both cases judicial staff engaged in independent factual research and, in doing so, discovered and brought to the attention of the judge factual information that had not been introduced into evidence by the parties. This type of factual research is of a different nature than searching the district court's ECF system. *See Tejero*, 955 F.3d at 464; *see also Sovereign Mil. Hospitaller v. Fla. Priory of Knights Hospitallers*, 702 F.3d 1279, 1296 (11th Cir. 2012) (criticizing district judge's "extra-record Internet research into similarly named organizations" in a trademark case and cautioning the judge to "limit its analysis to facts in the record").

We think the Brocatos are correct that the judge's opinion was derived from information that came from an extrajudicial source. The online obituary was discovered through an Internet search by the judge's staff. It seems likely that but for the staff's actions in performing the online search and bringing the date of Mrs. Carter's death to the judge's attention, the judge would not have obtained the information nor formulated an opinion that Judith

committed perjury.  No evidence was introduced at trial establishing the precise date of Mrs. Carter's death, and Judith's admittedly incorrect testimony—regardless of whether it was willful or an innocent mistake—was not impeached on cross-examination or otherwise disputed by the Government.  That Mrs. Carter's death certificate was a document subject to judicial notice does not change the analysis because, even if the information (the date of Mrs. Carter's death) was later *verified* via a "judicial" source, the initial source of the information from which the judicial opinion was *derived* was nonetheless extrajudicial.

**B.**

Of course, while an extrajudicial source weighs in favor of recusal, it alone may not be sufficient to find bias or the appearance of partiality. *Liteky*, 510 U.S. at 555; *Tejero*, 955 F.3d at 463.  The ultimate standard remains, under § 144, whether the judge has an actual personal bias, and under § 455(a), "whether a reasonable and objective person, knowing all of the facts, would harbor doubts concerning the judge's impartiality." *Jordan*, 49 F.3d at 155 (citing *Liljeberg*, 486 U.S. at 860–61).

The Brocatos argue that the district judge was biased as evinced by her stated opinion that Judith committed perjury and because that opinion was based on an extrajudicial source.  They assert that the judge's bias had an effect on sentencing, and that they should have been assessed a lower restitution amount and granted a downward variance.  However, as the Government points out, the Brocatos do not challenge their sentences on appeal or identify any specific error made by the district court at sentencing.  Rather, the Brocatos merely recite what they consider "valid reasons" that a different judge could rely on to give them a lesser sentence, i.e. one below the guidelines range.

The Government argues that, even assuming Mrs. Carter's date of death was an extrajudicial fact, there was no appearance of impartiality under § 455(a) based on the judge's reference to "perjury" when setting postconviction bond pending sentencing.  For support, the Government cites the following circumstances:  (1) the judge did not actively direct her staff to investigate Judith's credibility, but instead was a passive recipient of the information that staff discovered; (2) when she did learn of the information, she informed both parties and ensured that the jury was not affected; (3) the judge made the remark about "perjury" before receiving either the PSR or Judith's attestation that she made an honest mistake in her testimony, and later stated that the inconsistent testimony would "have no effect on the sentencing of the Brocatos"; (4) consistent with the PSR, the judge did not apply an obstruction-of-justice enhancement; and (5) the judge sentenced the Brocatos at the bottom-end of the guidelines range and made no reference to perjury at sentencing.

After a careful review of the record, we conclude that a reasonable and objective observer, aware of all of the facts and circumstances, would not harbor doubts about the judge's impartiality.  To start, we do not in any way condone Internet searches concerning a witness's credibility, or any type of similar investigation by court staff into factual matters.  This sort of *ex parte* fact-gathering is improper.  *See Kennedy*, 551 F.2d at 596; *Sovereign Mil. Hospitaller*, 702 F.3d at 1296.  Such activity has the potential to raise reasonable questions concerning impartiality, and it should not occur.  We also find the district judge's use of the term "perjury" regrettable in light of the context in which the inconsistent testimony was identified.  With that said, however, we think that a review of *all* of the facts and circumstances in this case dispels any reasonable doubts created by staff's improper Internet search or the judge's use of the word "perjury."  *See Andrade*, 338 F.3d at 455 ("[R]eview should entail a careful consideration of context, that is, the

entire course of judicial proceedings, rather than isolated incidents." (citing *Sao Paulo State of Fed. Rep. of Brazil v. Am. Tobacco Co.*, 535 U.S. 229, 232–33 (2002) and *United States v. Avilez-Reyes*, 160 F.3d 258, 259 (5th Cir. 1998))); *see also Liteky*, 510 U.S. at 555 (noting that "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases" will not always support a bias or partiality challenge even when an extrajudicial source is involved).

Here, we find it significant that the district court did not apply an obstruction-of-justice enhancement for perjury, but instead adopted the PSR's determination that "misinformation" in Judith's testimony concerning the source of the $9,000 was not "purposeful," and that the district court sentenced both Judith and Dick at the bottom of the guidelines range. Further, the district judge's rulings at sentencing were consistent with the guidelines rather than indicative of bias, the Brocatos do not challenge their sentences on appeal, and we do not think the district judge's denial of the Brocatos' requests for downward variances creates a reasonable appearance of bias. Also, regarding the reasons for setting postconviction bond, the record reflects that the district judge cited "testimony about shredding documents" and "discarding evidence," in addition to "perjury."

Finally, we note that the Brocatos waited more than six months after the judge's remarks were made to move for recusal; the in-chambers conference and setting of postconviction bond both occurred on February 5, but the motion to recuse was not filed until August 21. *See Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994) (stating general rule that "one seeking disqualification must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification"). However, we also note that on August 14—a week before the motion was filed—the district judge requested a certified copy of Mrs. Carter's death

certificate. Altogether, we do not consider the Brocatos' delay as a dispositive fact, but we note it as a relevant circumstance.

Considering all of these facts and circumstances, a reasonable and objective person would not harbor doubts concerning the judge's impartiality or question whether bias affected the Brocatos' sentences. The Brocatos have not shown an abuse of discretion under § 455(a).

As there was no abuse of discretion under § 455(a), there was no abuse of discretion under § 144 because "section 455 imposes the stricter standard." *Phillips v. Joint Legis. Comm. on Performance & Expenditure Rev. of State of Miss.,* 637 F.2d 1014, 1019 n.6 (5th Cir. 1981); *see also Liteky*, 510 U.S. at 548 (stating that § 144 "seems to be properly invocable only when § 455(a) can be invoked anyway").[1]

---

[1] The Brocatos due process argument also fails. Because a "fair trial in a fair tribunal is a basic requirement of due process," a defendant's due process rights are violated when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (quoting *Murchison*, 349 U.S. at 136 and *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). "The Due Process Clause demarks only the outer boundaries of judicial disqualifications," however, and its application is thus "confined to rare instances." *Id.* at 889–90. The pertinent question is "not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams*, 136 S. Ct. at 1905. The Supreme Court has emphasized that it requires fairly "extreme facts" to meet this standard. *Caperton*, 556 U.S. at 887. In *Caperton*, for example, the Supreme Court found a due process violation where a state appellate judge did not recuse himself from an appeal of a $50 million jury verdict against a coal company. *Id.* at 872. The "extraordinary situation" in that case that warranted recusal, *id.* at 887, was that the CEO of the coal company had spent $3 million to help get the appellate judge elected after the jury verdict at issue but before it was reviewed on appeal, and that $3 million had far exceeded the $1 million spent by the judge's campaign committee. *Id.* at 872–74. In *Williams*, the Supreme Court held that an unacceptable risk of bias existed when a judge, in his previous job as district attorney, had personally authorized his subordinates to pursue a death sentence against the petitioner. 136 S. Ct. at 1907–09. And in *Mayberry v. Pennsylvania*, the court held that the Due Process Clause required criminal contempt proceedings to take place

No. 20-40624

**IV.**

Because the Brocatos have shown no due process violation or abuse of discretion under either 28 U.S.C. §§ 144 or 455(a) in this case, we AFFIRM the district court's denial of their motion to recuse.

---

before a different judge when the trial judge had been subjected to highly personal attacks by *pro se* prisoner-defendants throughout the entirety of a 21-day jury trial for prison breach. 400 U.S. 455, 455, 465–66 (1971). By comparison, the circumstances in this case simply do not include the type of extreme facts that suggest an objective risk of unconstitutional potential for bias.